CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
September 18, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| Nancy Crockett, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:24-cv-00084 |
| | ) | |
| Commonwealth of Virginia *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendants Commonwealth of Virginia, Virginia Department of Corrections ("VDOC"),[1] David Newcomer, and Roger Waltz's motion to dismiss (Dkt. 11). The motion is fully briefed and ripe for review. For the reasons stated below, the court will grant Defendants' motion to dismiss.

---

[1] In the caption of her amended complaint, Crockett lists as defendants "Commonwealth of Virginia | Virginia Department of Corrections" on one line, directing service to both the Virginia Attorney General and the Director of VDOC. (Am. Compl. (Dkt. 4-1 at 100–19).) Further, although Crockett refers to "Commonwealth of Virginia | Virginia Department of Corrections" using the singular throughout her complaint, she also alleges that the two are separate entities. (*Id.* ¶ 2 ("At the times material hereto, the Commonwealth of Virginia is a state, and the Virginia Department of Corrections . . . is the governmental agency responsible for operating prisons and correctional facilities in the Commonwealth of Virginia.").) Although Crockett now explains that "[t]he purpose of [her] phrasing . . . was to clarify that this matter arises from the Commonwealth of Virginia's actions and inactions within the [VDOC]" and that she did not intend to name VDOC as a defendant, (Pl.'s Br. in Opp'n at 7 (Dkt. 13)), the court finds that Crockett did name the Commonwealth of Virginia and VDOC as two separate defendants in her amended complaint. *Cf. Savage v. N.C. Dep't of Corr.*, No. 5:06-CV-171, 2007 WL 2904182, at *14 (E.D.N.C. Sept. 29, 2007) (finding lack of summonses dispositive as to potential additional defendants named within the complaint). The court will therefore refer to them separately hereafter.

# I.    Background

## A. Factual History

The facts in this section are taken from Crockett's amended complaint and are accepted as true when resolving the motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nancy Crockett has worked as a Corrections Officer with VDOC since August 10, 2021. (Am. Compl. ¶ 7 (Dkt. 4-1 at 100–19).)  During the period of time relevant to her complaint, Crockett worked on a "roving contract": that is, instead of reporting to her "home" prison, River North Correctional Center, she would report to a short-staffed facility for a seven-day-on, seven-day-off work schedule.  (*Id.* ¶ 8.)  In February 2023, the short-staffed facility to which she reported was Augusta Correctional Center in Augusta County, Virginia, located approximately three hours away from Crockett's home facility.  (*Id.*)

On February 1, 2023, while working at Augusta Correctional Center, Crockett was informed that she would be trained by an Officer Watkins in Master Control.  (*Id.* ¶ 9.)  Master Control was the location of "all the controls for the doors . . . in the prison." (*Id.* ¶ 10.)  When Officer Watkins arrived, he "appeared agitated," complaining about his paycheck and stating that "either the bank or HR fucked up and shit is about to get real if it isn't fixed today." (*Id.* ¶ 11.)  After an HR representative came and informed Officer Watkins that his paycheck was correct, a captain directed Officer Watkins to report to another superior officer.  (*Id.* ¶¶ 12–13.)  Approximately half an hour later, Officer Watkins returned, "more visibly upset than before." (*Id.* ¶ 14.)  Officer Watkins reported that he had been on short-term disability because of stress stemming from Augusta Correctional Center, and he then punched a logbook and

began pacing the room.  (*Id.*)  He also began making "threatening statements," including the warning that "if this ended up stressing out his fiancé, he would 'shoot or kill every mother fucker from this compound.'"  (*Id.* ¶ 15.)  Officer Watkins additionally talked about taking guns from Master Control and "picking one off at a time."  (*Id.* ¶ 16.)  He continued making similar statements for hours.  (*Id.* ¶ 18.)

While this was occurring, a Sergeant Johnson entered Master Control.  (*Id.* ¶ 19.)  Sergeant Johnson and Officer Watkins fist-bumped and discussed plans to attend a "rage room," where customers can break and destroy various objects.  (*Id.*)  Sergeant Johnson then left Crockett alone with Officer Watkins.  (*Id.*)  Some time later, Sergeant Johnson called sounding as though he had been crying.  (*Id.* ¶ 20.)  Officer Watkins directed Crockett to let him out of Master Control and into the Watch Room, which Crockett did.  (*Id.*)  After returning a few minutes later, Officer Watkins then "sprinted to Front Entry," behavior which Crockett found "bizarre."  (*Id.*)  Following these events, Crockett got a break and informed relief personnel about Officer Watkins's behavior.  (*Id.* ¶ 21.)  Relief personnel responded that Officer Watkins was "just blowing off steam."  (*Id.* ¶ 22.)

When Officer Watkins returned approximately two or three hours later, he seemed "calmer."  (*Id.* ¶ 23.)  But shortly thereafter, another superior officer called to inform Officer Watkins that he had been drafted to work overtime hours, triggering another outburst of anger and "comments about killing everyone, including Ms. Crockett, once again."  (*Id.*)  Crockett was ultimately confined in Master Control with Officer Watkins for nine hours.  (*Id.* ¶ 24.)  During that time, Officer Watkins had access to two AR-15s and 12-gauge shotguns, as well

as 60 rounds of ammunition.  (*Id.* ¶ 25.)  Crockett, on the other hand, had no protection while Officer Watkins "threatened to kill her and every other officer there," stating that he "control[led] who gets in and out of this prison" and that he "decide[d] who lives and dies in this prison."  (*Id.* ¶¶ 24, 26.)  On the few occasions she was able to contact others, Crocket reported these events to various superior officers, all of whom brushed off the reports.  (*Id.* ¶ 27 (noting that the officers said it was "just Watkins").)

The next day, Crockett was informed that she was returning to Master Control for another shift.  (*Id.* ¶ 28.)  Scared, Crockett asked that she be able to work elsewhere.  (*Id.* ¶ 29.) The captain on duty, who knew of the events that happened the night prior, questioned whether Crockett was refusing her post.  (*Id.* ¶ 30.)  Crockett responded that she could not go to Master Control with Officer Watkins, but that she was willing to return if someone else could work with and train her.  (*Id.* ¶ 31.)  Crockett ultimately returned to Master Control that night.  (*Id.* ¶ 32.)  However, because she had not received any training the night before due to Officer Watkins's behavior, she requested help from two superior officers.  (*Id.* ¶ 33.)  The officers pushed back on Crockett's request, suggesting that she should be able to run Master Control alone and sending "only very minimal help."  (*Id.*)

Two days later, on February 4, 2023, Sergeant Tharpe asked Crockett "why there was a running joke about her not working in Master Control anymore" when Crockett had agreed to be trained for the position.  (*Id.* ¶ 34.)  Crockett began crying and informed Sergeant Tharpe of what had happened with Officer Watkins, after which Sergeant Tharpe reported the incident to two superior officers.  (*Id.* ¶¶ 35–36.)

On February 5, 2023, Defendant Newcomer, the Warden of Augusta Correctional Center, directed Crockett to write a statement about the incident within one hour. (*Id.* ¶ 37.) Concerned because "[w]riting a truthful statement identifying negative behavior[] is a death knell in the VDOC," particularly for a woman, Crockett asked instead to call her Warden at her home prison, David Anderson. (*Id.* ¶ 38.) During that call, which Crockett made in the presence of a captain and lieutenant from Augusta Correctional Center, Crockett informed Warden Anderson "that she was held hostage by a disgruntled employee and after she reported it, nothing was done, and now they were trying to force her to give a written statement." (*Id.* ¶¶ 39–40.) Warden Anderson, in response, stated that he wanted Crockett to "get the fuck out of there." (*Id.* ¶ 41.) He also told the Augusta Correctional Center officers present that Crockett was one of his top officers, to which the Augusta officers replied that Crockett had given them no problems during her time there. (*Id.* ¶¶ 42–43.) Crockett then requested that she be able to leave the facility; her husband picked her up thereafter. (*Id.* ¶¶ 44–45.) Warden Anderson asked Crockett to meet with him the following morning. (*Id.* ¶ 46.)

The next morning, Crockett met with Warden Anderson and the Assistant Warden in Warden Anderson's office. (*Id.* ¶ 47.) Warden Anderson asked Crockett to tell him what had happened and asked what it would take for her to keep the incident quiet. (*Id.* ¶ 48.) Crockett replied that she only wanted the same hours and pay that she had been receiving during her roving contract, as she had taken that position for the pay it provided. (*Id.* ¶¶ 49–50.) Warden Anderson then indicated that Crockett could work at River North while the incident was under investigation. (*Id.* ¶ 51.) Crockett provided her statement that day. (*Id.* ¶ 52.)

The investigation ultimately concluded on March 14, 2023. (*Id.* ¶ 53.) At that point, Warden Anderson informed Crockett that Warden Newcomer would allow only one "solution": Crockett was never allowed to work at Augusta Correctional Center again while Newcomer served as the Warden, and the only facility in Virginia that Newcomer would allow her to rove at was Sussex I. (*Id.* ¶ 54.) That meant that, in order for Crockett to keep receiving her higher pay, she would have to travel five hours from her home (two hours further than Augusta Correctional Center) and work at a facility that she was informed was "being run by gang members." (*Id.*) Warden Anderson recommended that it would be safest for Crockett to take an annual pay cut of nearly $50,000 to avoid working at Sussex I. (*Id.*) However, Crockett ultimately agreed to a new six-month roving contract at Sussex I in order to keep her higher pay. (*Id.* ¶¶ 55–56.)

That assignment was short-lived. In May 2023, just two months into Crockett's new roving contract, Crockett received notice that the roving program was being changed such that correctional officers could no longer rove outside of their region. (*Id.* ¶ 57.) The only correctional center available for roving within Crockett's region was Augusta Correctional Center, from which Crockett had been banned by Warden Newcomer. (*Id.*) In response, Crockett called Regional Manager Roger Waltz and met with the Sussex I Warden to discuss the possibility of staying at Sussex I on the roving contract. (*Id.* ¶ 58.) Crockett was informed by HR that "it should not be a problem" for her to stay at Sussex I and that "an exception to the new policy should be made for her" due to the incident at Augusta Correctional Center.

(*Id.* ¶ 59.)  Crockett was also informed that VDOC was so understaffed at the roving-eligible facilities that it would not prevent her from roving.  (*Id.*)

Despite this conversation, Crockett learned in June 2023 that she was not being given a new roving contract and that she was being terminated from the roving program at the end of her current contract.  (*Id.* ¶ 60.)  Crockett reported to Lisa Hernandez, Western Regional Administrator, that she believed this was an act of retaliation, noting that she had graduated with honors from the academy, had worked for VDOC for nearly two years, had perfect attendance, was never late, and had successfully worked in three different facilities without any issues.  (*Id.* ¶ 61.)  Crockett noted that her exemplary record was unlike that of other individuals who had received roving contracts despite disciplinary problems, including one Officer Holt, who received a roving contract in spite of his or her disciplinary record for bringing outside items into prison and not completing training.  (*Id.* ¶¶ 61–62.)  Crockett was ultimately informed that Warden Newcomer, Waltz, and the Augusta Correctional Center team decided to deny her a roving contract "because of the incident that occurred in February 2023."  (*Id.* ¶¶ 63–64.)  At the same time, Crockett was told that Warden Anderson spoke highly of her and that she "ha[d] a 'bright future with the VADOC.'"  (*Id.* ¶ 64.)

In early July 2023, Crockett was moved to Cold Springs Correctional Unit in Greenville, Virginia.  (*Id.* ¶ 65.)  After two weeks, Crockett was drafted to work for a week at Augusta Correctional Center.  (*Id.* ¶ 66.)  Although Warden Newcomer had prohibited Crockett from roving at Augusta Correctional Center, he did not prevent her from working there at her normal pay pursuant to a draft.  (*Id.* ¶ 67.)  Even so, Warden Newcomer represented that he

would never approve overtime for Crockett while at Augusta Correctional Center, functionally limiting Crockett to only the lowest-paid work at the facility. (*Id.* ¶¶ 68–69.)

During the week Crockett spent at Augusta Correctional Center, she learned that none of the supervisors to whom she had reported the events on February 1, 2023, had been disciplined for their failure to report the incident, other than short assignments to the day shift. (*Id.* ¶ 70.) Instead, Crockett learned that her departure was intended to resolve the issue, a decision made by Warden Newcomer at a supervisors' meeting. (*Id.*) Crockett also learned that following the February 1 shift, Officer Watkins returned home and severely abused his girlfriend, ultimately driving her to seek treatment in a psychiatric ward. (*Id.* ¶ 71.) Moreover, Crockett discovered that Officer Watkins had displayed aggressive and violent behavior prior to February 1, 2023, of which the prison was aware due to reports that had been made. (*Id.* ¶ 72.) Despite this information, Warden Newcomer did not take any action to protect Crockett from Officer Watkins's behavior. (*Id.*)

Crockett has been diagnosed with Post-Traumatic Stress Disorder ("PTSD"), complex PTSD, and panic disorder resulting from these events. (*Id.* ¶ 73.) She also suffers from various physical ailments related to the incident, including night sweats, insomnia, an autoimmune disease, psoriasis, weight gain, multiple infections, and intestinal inflammation. (*Id.* ¶ 106.) Following a complex PTSD breakdown in August 2023, Crockett was forced to go on short-term disability for two months. (*Id.* ¶¶ 75–76, 107.) Crockett returned to work in October 2023. (*Id.* ¶ 77.) To date, she has been prevented from roving at other facilities, which has

limited her pay significantly. (*Id.* ¶ 79.) Warden Newcomer has recently been moved to a new prison. (*Id.* ¶ 80.)

## B. Procedural History

On January 10, 2024, Crockett filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging gender discrimination, sexual harassment, and retaliation. (*Id.* ¶ 78.) On April 30, 2024, Crockett filed a complaint in the Circuit Court for Augusta County against Defendants Commonwealth of Virginia, VDOC, Newcomer, and Waltz. (*See* Compl. (Dkt. 4-1 at 2–16).) The EEOC issued a Notice of Right to Sue on July 26, 2024, (Am. Compl. ¶ 6; *see* EEOC Notice of Right to Sue (Dkt. 4-1 at 118)), after which Crockett filed a motion to amend her complaint, (Dkt. 4-1 at 96–97). Crockett's motion to amend specified that she had not yet served Defendants with the original complaint, and no Defendant had yet appeared in the case. (*Id.*) The circuit court judge entered an order granting the motion on August 21, 2024, rendering Crockett's amended complaint operative the same day. (*Id.* at 120.) The amended complaint was served on Defendants on September 26, 2024. (Dkt. 1 at 1.)

Crockett's amended complaint alleges five counts. Count I is a claim of discrimination and retaliation under the Virginia Fraud and Abuse Whistle Blower Protection Act ("VFAWPA"), Va. Code Ann. § 2.2-3011, against Newcomer and Waltz. (Am. Compl. ¶¶ 81–89.) All other counts are brought against the Commonwealth of Virginia and VDOC. Count II alleges a violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. (*Id.* ¶¶ 90–100.) Count III alleges a Virginia Tort Claims Act ("VTCA"), Va. Code Ann. § 8.01-

195.1 *et seq.*, claim for negligence, negligent infliction of emotional distress, and negligent retention.  (*Id.* ¶¶ 101–09.)  Count IV is a claim for Title VII gender discrimination.  (*Id.* ¶¶ 110–15.)  And finally, Count V is a claim for Title VII retaliation.  (*Id.* ¶¶ 116–22.)  Crockett seeks a judgment of "equitable relief, injunctive relief, compensatory damages, including emotional pain and suffering damages, pecuniary loss, including lost wages and benefits, front wages and benefits, and out-of-pocket medical expenses, in the total amount of [$5 million]," as well as costs, attorney's fees, and post-judgment interest.  (*Id.* at 17–18.)

On October 16, 2024, Defendants timely removed the action to the U.S. District Court for the Western District of Virginia pursuant to 28 U.S.C. § 1441 *et seq.*  (Dkt. 1 at 1.)  On November 6, 2024, Defendants filed a motion to dismiss the amended complaint, (Dkt. 11), and memorandum in support, (Defs.' Mem. (Dkt. 12)).  The motion seeks to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  (*Id.* at 1.)  Crockett filed a brief in response two weeks later, (Pl.'s Br. in Opp'n (Dkt. 13)), and Defendants filed a reply the week after, (Defs.' Reply (Dkt. 14)).

## II.    Standard of Review

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction over a complaint.  Fed. R. Civ. P. 12(b)(1).  A defendant may bring either a facial or factual challenge to subject matter jurisdiction.  *See Beck v. McDonald*, 848 F.3d 262, 270 (4th

Cir. 2017). A facial challenge, which Defendants raise in relation to Counts I and III,[2] "contend[s] that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (internal quotation marks omitted). "[T]he facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

A court may dismiss a claim for lack of personal jurisdiction under Rule 12(b)(2). Fed. R. Civ. P. 12(b)(2). A challenge to personal jurisdiction under Rule 12(b)(2) is addressed by the judge "with the burden on the plaintiff . . . to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). When personal jurisdiction challenges are resolved without a pretrial evidentiary hearing, "the plaintiff need prove only a *prima facie* case of personal jurisdiction." *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). A *prima facie* standard requires that "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676. The court may consider evidence from both parties when making its decision. *See Mylan Lab'ys, Inc.*, 2 F.3d at 62.

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve

---

[2] Where a party's motion does not specify the theory under which it challenges subject matter jurisdiction, the court may draw a reasonable inference. *See Yanez v. Walker*, No. 5:24-cv-00025, 2024 WL 5190040, at *3 (W.D. Va. Dec. 20, 2024) (treating sovereign immunity defense as facial challenge to the court's subject matter jurisdiction).

contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In reviewing a motion to dismiss, the court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).  While evaluation is generally limited to the complaint itself, Fed. R. Civ. P. 12(d), a court may also examine documents attached to the complaint as exhibits or those explicitly incorporated into the complaint by reference. Fed. R. Civ. P. 10(c); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

### III.    Analysis

#### A.  VDOC's Capacity to Be Sued

Defendants first move to dismiss Defendant VDOC under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  (Defs.' Mem. at 5–6.)  They argue that, as "an operating or administrative division of the Commonwealth," VDOC is not an entity capable of being sued in its own name under Virginia law.  (*Id.* at 6.)

Under Federal Rule of Civil Procedure 17, the "[c]apacity to sue or be sued is determined," for entities like VDOC, "by the law of the state where the court is located."  Fed.

R. Civ. P. 17(b)(3).  In Virginia, "an operating *division* of a governmental entity . . . cannot be sued unless the legislature has vested the operating division with the capacity to be sued." *Conte v. Virginia*, No. 3:20-cv-00038, 2023 WL 3121220, at *4 (W.D. Va. Apr. 27, 2023) (emphasis added) (quoting *Smith v. Town of South Hill*, 611 F. Supp. 3d 148, 167 (E.D. Va. 2020)); *see Dimaano v. Va. Ctr. for Behav. Rehab.*, No. 3:23-cv-312, 2024 WL 3823795, at *16–17 (E.D. Va. Aug. 13, 2024).  But VDOC is not a division of a governmental entity.  Rather, it is an agency of the Commonwealth of Virginia.  Va. Code Ann. § 53.1-8 ("There shall be in the executive department a Department of Corrections responsible to the Governor."); *see, e.g.*, *Brown v. Collier*, No. 7:23-cv-00567, 2024 WL 3184651, at *2 (W.D. Va. June 26, 2024) ("VDOC is a state agency.").  Accordingly, VDOC may properly be subject to suit.  *See Blackburn v. Com. Dep't of Corr.*, No. 1:01-cv-00039, 2002 WL 242352, at *4 (W.D. Va. Feb. 19, 2002) ("The only viable defendant in this [Title VII] case is the Commonwealth of Virginia Department of Corrections."); *see also Johnson v. Univ. of Va. Med. Ctr.*, No. 3:06-cv-00061, 2007 WL 137111, at *4 (W.D. Va. Jan. 17, 2007) (finding that the Rector and Visitors of the University of Virginia, a state agency, and the Commonwealth of Virginia were the "proper" defendants).

**B. Section 504 of the Rehabilitation Act (Count II)**

Crockett alleges that the Commonwealth and VDOC committed discrimination and retaliation in violation of Section 504 of the Rehabilitation Act.  (Am. Compl. ¶¶ 90–100.) Section 504 states in relevant part that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance," including the operations of "a department, agency, . . . or other instrumentality of a State." 29 U.S.C. § 794(a), (b)(1)(A).

Crockett alleges that she is a qualified individual with PTSD, complex PTSD, and panic disorder, all of which qualify as disabilities under Section 504. (Am. Compl. ¶ 92.) She claims that, after the Commonwealth and VDOC learned of her disabilities, they both "refused to permit [her] to rove, even at Augusta, despite Warden Newcomer no longer being stationed there." (*Id.* ¶ 95.) This refusal "has prevented [her] from making more money roving because of her disabilities and engagement in the protected activity of using a period of leave as a reasonable accommodation." (*Id.* ¶ 96.) Crockett claims that, in so doing, the Commonwealth and VDOC acted "with malice or reckless indifference" to her rights and caused her monetary harm. (*Id.* ¶¶ 97–99.)

The Commonwealth and VDOC do not contest that they are subject to suit under Section 504.[3] Rather, they argue that Crockett has not adequately alleged that her disabilities were the "sole reason" she was denied a new roving contract or other benefit, as required by the statute. (Defs.' Mem. at 12–13.) Specifically, they note that Crockett was denied a new roving contract in June 2023 and that she alleges in her amended complaint that the denial was based on the February 2023 incident—not because of any disability. (*Id.* at 12.) Additionally, they argue that Crockett was denied the new roving contract prior to her two

---

[3] Nor could they: "[a] state or state agency is not immune from suit under the [Act]." *Thomas v. Va. Dep't of Transp. (Bristol Dist.)*, No. 1:22-cv-00036, 2023 WL 4355055, at *4 n.7 (W.D. Va. July 5, 2023) (citing 42 U.S.C. § 2000d-7; *see Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir. 2005).

months of short-term disability leave, and that therefore any adverse action could not possibly be based on her protected leave.  (*Id.* at 12–13.)  For clarity, the court will address Crockett's discrimination and retaliation claims separately.

1.  Discrimination

To begin, Crockett is not obligated to establish a *prima facie* case of discrimination or retaliation at the pleading stage of litigation.  *Whorley v. Int'l Paper*, 620 F. Supp. 3d 434, 437 & n.2 (W.D. Va. 2022) (addressing claim under the Americans with Disabilities Act ("ADA")); *see Barbour v. Garland*, 105 F.4th 579, 590 (4th Cir. 2024) (finding plaintiff need not establish *prima facie* case for Title VII retaliation claim to survive motion to dismiss).[4]  Nevertheless, although "a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss," she still must plead factual allegations which are "enough to raise a right to relief above the speculative level."  *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010).

To establish a claim of disability discrimination under Section 504, a plaintiff must show (1) that she is disabled; (2) that she was otherwise qualified for the position; and (3) that she suffered an adverse employment action solely on the basis of her disability.  *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019).  Defendants do not contest that Crockett has a

---

[4] Courts routinely rely on precedent under the ADA in resolving Rehabilitation Act cases, because "courts apply the same standards" to both statutes.  *See Herkert v. Bisignano*, -- F.4th --, 2025 WL 2348704, at *4 (4th Cir. Aug. 14, 2025).  Similarly, "because the ADA, in turn, 'echoes and expressly refers to Title VII, and because the two statutes have the same purpose . . . courts have routinely used Title VII precedent in ADA cases.'"  *Id.* (quoting *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001)).

covered disability, nor that she is otherwise qualified for her position as a roving correctional officer.  Rather, Defendants' arguments go to the causation element of Crockett's claim.

The court agrees with Defendants that Crockett has not met her burden of plausibly alleging a Section 504 discrimination claim at this stage of litigation.  Crockett does not specifically allege when she was diagnosed with her disabilities, nor whether the Commonwealth and VDOC became aware of them prior to her short-term disability leave beginning in August 2023.  Accordingly, she has not alleged sufficient facts to plausibly connect Defendants' learning of her disabilities with their non-renewal of her roving contract in June 2023.  Even had those dates been properly alleged, Crockett explicitly alleged that she was told she was not being recommended for a new roving contract because of the February 2023 incident—not her disabilities.  (Am. Compl. ¶ 64.)  Accordingly, even had Crockett alleged that the Commonwealth and VDOC became aware of her disabilities prior to June 2023, she has not alleged any facts to support a claim that the non-renewal was based on anything other than the February 2023 incident.

Nor has Crockett sufficiently alleged that Defendants' refusal to allow her to rove at Augusta Correctional Center following Warden Newcomer's departure is causally related to her disabilities.  Crockett has alleged no facts that connect this employment action with Defendants' knowledge of her disabilities; rather, the only inference the court could make from Crockett's amended complaint is that she was prevented from working there due to the February 2023 incident, not because of her PTSD, complex PTSD, or panic disorder.  Because

Crockett does not allege sufficient facts to support her claim, the court will grant Defendants'
motion to dismiss as to the discrimination element of Count II.

2. Retaliation

Turning next to Crockett's retaliation claim, the Rehabilitation Act "provides that no
person shall retaliate against an individual because that individual engages in activity
challenging an employer's alleged discrimination." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 272
(4th Cir. 2001). To survive a motion to dismiss, Crockett must plausibly allege (1) that she has
engaged in protected conduct; (2) that she suffered an adverse action after engaging in that
protected conduct; and (3) that there was a causal connection between the protected activity
and the adverse action. *See S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 78 (4th
Cir. 2016). For the purposes of a retaliation claim, an adverse action must be "materially
adverse"; that is, "serious enough to 'dissuade a reasonable worker from making or supporting
a charge of discrimination.'" *Herkert*, 2025 WL 2348704, at *6 (quoting *Muldrow v. City of St.
Louis*, 601 U.S. 346, 357 (2024)).

Here, Defendants do not contest that Crockett engaged in protected activity when she
took two months of medical leave. They do, however, argue that the adverse action she
suffered—the non-renewal of her roving contract—occurred prior to her protected activity,
so there can be no causal connection between the two events. Defendants overlook Crockett's
argument that the adverse employment action at issue was actually the refusal to allow her to
return to Augusta Correctional Center following Newcomer's departure, which occurred at
some point shortly prior to the filing of Crockett's original complaint. (*See* Dkt. 4-1 at 11

- 17 -

("Warden Newcomer has recently been moved to a new prison[.]").)  However, Crockett's amended complaint does not include any further allegations that provide additional context for her retaliation claim.  (*See* Am. Compl. ¶ 80.)

Despite Defendants' oversight, the court agrees with Defendants that Crockett has failed to plausibly allege a Section 504 retaliation claim.  In short, Crockett provides no factual allegations that would support a finding that she was denied the ability to return to Augusta Correctional Center because she engaged in a protected activity by taking medical leave.  To the contrary, Crockett's allegations indicate that she was not allowed to return due to her involvement in the February 2023 incident, not because she had taken leave.

Nor does she allege sufficient temporal proximity for the court to plausibly infer causation between the two events in the absence of other factual allegations.  Crockett does not allege a date for Newcomer's departure or, more importantly, the decision not to allow her to return to Augusta Correctional Center.  Without those allegations, the court cannot determine whether there was sufficient temporal proximity between Crockett's medical leave and the decision about her placement to support a reasonable inference of causation.  *See, e.g.,* *West v. City of Charlottesville*, No. 3:24-cv-00027, 2025 WL 256998, at *12–13 (W.D. Va. Jan. 21, 2025) (discussing the Fourth Circuit's approach to determining temporal proximity, including through actions taken "at the first opportunity" following protected activity).  Without further factual allegations, the court cannot find that Crockett has plausibly alleged this claim.  The court accordingly will dismiss Crockett's claim for Section 504 retaliation against the Commonwealth and VDOC.

### C. Title VII Discrimination (Count IV)

Crockett next brings a Title VII claim for gender discrimination.  (Am. Compl. ¶¶ 110–15.)  Here, absent direct evidence of discrimination, a plaintiff must ultimately establish membership in a protected class, satisfactory job performance, adverse employment action, and different treatment than similarly situated employees outside the protected class.  *Coleman*, 626 F.3d at 190.  However, to survive a Rule 12(b)(6) motion, a plaintiff need not "plead facts that constitute a prima facie case," so long as her "[f]actual allegations [are] enough to raise a right to relief above the speculative level."  *Id.* (internal quotation marks omitted).  While allegations of an identical comparator may prove sufficient for the court to draw a plausible inference of gender discrimination, they are not necessary for a claim to survive.  *See Whitehurst v. Bedford Cnty. Sch. Bd.*, No. 6:19-cv-00010, 2020 WL 3643132, at *5–7 (W.D. Va. July 6, 2020).  When a plaintiff does not identify a similarly situated comparator, the court must evaluate her claims to determine whether she has "establish[ed] an inference of unlawful discrimination through other means."  *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017).

Defendants do not contest that Crockett has alleged facts that support the first three elements of a *prima facie* case under Title VII.  Rather, they argue that Crockett fails to plausibly allege disparate treatment based on her gender.  Specifically, they contend that "[t]here are no facts alleged in the Amended Complaint that [Crockett] was treated differently from male employees or that the denial of a new roving contract was motivated by gender bias."  (Defs.' Mem. at 18.)

This court agrees.  Crockett does allege that other correctional officers were given roving contracts when she was denied one in June 2023, and that these officers "had disciplinary issues, unlike Ms. Crockett." (Am. Compl. ¶¶ 61–62; *see id.* ¶ 119.)  But Crockett does not allege that these officers were male, that they had the same level of experience, or that they were otherwise allowed to rove because of their gender.  Accordingly, Crockett's comparator allegations do not support a plausible inference of gender discrimination.

Nor do her other allegations.  Crockett has plausibly alleged that the Commonwealth and VDOC took various employment actions based upon her involvement in the events of February 2023.  That is not the same thing as taking action based upon Crockett's gender.  The only alleged fact that could lend support to a reasonable inference of gender discrimination is that she had been trained to "keep things 'in the department,'" especially as a woman.[5]  (*Id.* ¶ 38.)  But this fact alone is insufficient to support Crockett's claim that the Commonwealth and VDOC discriminated against her based on her gender in their treatment of her roving contract.  Crockett accordingly fails to adequately allege a Title VII discrimination claim.

### D. Title VII Retaliation (Count V)

Crockett also brings a claim for Title VII retaliation against the Commonwealth and VDOC.  (*Id.* ¶ 116–22.)  She alleges that both Defendants retaliated against her by "preventing

---

[5] Crockett also alleges that Newcomer "apparently thought" Crockett's reaction to the February 2023 events was due to her gender.  (Am. Compl. ¶ 57.)  Because Crockett does not allege any facts to support this conclusory assertion, the court treats the allegation as speculative and insufficient to support her claim at this stage.

her from roving at Augusta Correctional Center, only permitting [her] to rove at Sussex [I], thereafter refusing to grant [her] a roving contract, and denying [her] the opportunity to work overtime hours when she was drafted to work at Augusta, on the basis of her complaints of sex discrimination, retaliation, and harassment, in violation of Title VII." (*Id.* ¶ 118.) Crockett further alleges that such actions were taken "in close temporal proximity" to her "protected reports." (*Id.* ¶ 120.) Defendants argue that Crockett's claim must fail because she did not engage in protected activity prior to the adverse employment actions and, therefore, she cannot plausibly allege causation. (Defs.' Mem. at 21–22.)

Like her claim for Section 504 retaliation, Crockett must plausibly allege that she engaged in protected activity, that her employer took an adverse action against her, and that those two events were causally linked. *See Noonan v. Consol. Shoe Co.*, 84 F.4th 566, 574 (4th Cir. 2023); *Prosa v. Austin*, No. 20-3015, 2022 WL 394465, at *26 (D. Md. Feb. 8, 2022) ("Courts typically apply the standards for Title VII retaliation claims to ADA and Rehabilitation Act retaliation claims."). Protected activity includes "complaining to superiors about suspected violations of Title VII," even if the complained-of action is not in fact a violation, so long as the employee's belief is "objectively reasonable." *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328 (4th Cir. 2018) (internal quotation marks omitted). Taking Crockett's amended complaint as a whole, the court finds there are two possible protected activities: Crockett's report to Lisa Hernandez, Western Regional Administrator, that she believed she was being retaliated against, and her EEOC filing on January 10, 2024. (Am. Compl. ¶¶ 6, 61.)

Starting with the latter, most of the adverse actions of which Crockett complains took place prior to January 10, 2024. "Common sense provides that one cannot retaliate against an employee for engaging in a protected activity until the employee actually engages in the protected activity." *Hill v. Panetta*, No. 1:12-cv-350, 2012 WL 12871178, at *17 (E.D. Va. Oct. 4, 2012). As such, Crockett cannot bring a retaliation claim based on her EEOC complaint for adverse actions taken prior to its filing.

Crockett does not explicitly allege that Defendants committed an adverse action in refusing to allow her to return to Augusta Correctional Center after Warden Newcomer's departure. (*See id.* ¶¶ 116–22.) However, even if the court were to infer that allegation from her complaint, Crockett does not provide any factual allegations which would plausibly support a finding that the Defendant's refusal to let Crockett return to Augusta Correctional Center and her EEOC filing were causally linked. Nor does Crockett give a date for that adverse action, so the court cannot reasonably determine whether the two events took place with sufficient temporal proximity to support a reasonable inference of causation.

As for Crockett's report to Hernandez, such a complaint could likely constitute protected activity under Title VII. *See Thomas v. Va. Dep't of Transp. (Bristol Dist.)*, No. 1:22-cv-00036, 2023 WL 4355055, at *6 (W.D. Va. July 5, 2023); *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). However, Crockett does not allege how Hernandez is connected to the two Defendants against whom she brings her Title VII claim. Moreover, Crockett does not allege that she reported any basis for the retaliation to Hernandez. (*See* Am. Compl. ¶ 61 (noting only that Crockett reported "that she believed she was being retaliated

against").)  Without more facts alleged, there is no reason for the court to believe that Defendants "understood, or should have understood," that Crockett was complaining of a Title VII violation.  *See Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012).  Additionally, Crockett does not allege the date on which this complaint occurred; the court therefore cannot make a determination as to whether Crockett has plausibly alleged temporal proximity to support causation, and Crockett does not plead any other factual allegations towards that causal link.  As such, the court will grant Defendants' motion to dismiss Crockett's Title VII retaliation claim.

### E.  VFAWPA (Count I) and VTCA (Count III)

Finally, Crockett alleges violations of the VFAWPA by Defendants Newcomer and Waltz and the VTCA by Defendants VDOC and the Commonwealth of Virginia.  (Am. Compl. ¶¶ 81–89, 101–09.)  Defendants argue that Newcomer and Waltz are entitled to sovereign immunity in their official capacities, and that they are unable to provide equitable relief in their individual capacities.  (Defs.' Mem. at 6–11.)  They also argue that VDOC and the Commonwealth are entitled to sovereign immunity from the VTCA claim.  (*Id.* at 13–16.)  A court in this district has recently held that "the VDOC cannot be sued under the VTCA." *Cavalieri v. Boyers*, No. 7:23-cv-00092, 2025 WL 1095883, at *6 (W.D. Va. Apr. 11, 2025) (citing *Rector & Visitors of the Univ. of Va. v. Carter*, 591 S.E.2d 76, 78 (Va. 2004)).  It also noted that while the VTCA's limited waiver of sovereign immunity allows certain tort claims to proceed against the state, those claims may be brought only in state court.  *Id.* (citing *Creed v. Virginia*, 596 F. Supp. 2d 930, 938–39 (E.D. Va. 2009)).

- 23 -

The court need not resolve those issues here, as it declines to exercise supplemental jurisdiction over Crockett's two state-law claims. The state law claims fall outside of the court's original jurisdiction, as the parties do not satisfy the diversity-of-citizenship requirements of 28 U.S.C. § 1332. Crockett is a citizen of Virginia, (Am. Compl. ¶ 1), as are Newcomer and Waltz, (id. ¶¶ 3–4). Because their shared citizenship defeats complete diversity, the court may not exercise diversity jurisdiction. *See Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 218 (4th Cir. 2015).

A district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The court has "wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)). "[G]enerally, when a district court dismisses all federal claims in the early stages of litigation . . . it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice." *Id.* (quoting *Banks v. Gore*, 738 F. App'x 766, 773 (4th Cir. 2018)). In deciding whether to exercise supplemental jurisdiction in this scenario, the court weighs multiple factors, including "judicial economy, convenience, fairness, and comity." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The court finds that the relevant factors weigh in favor of declining to exercise supplemental jurisdiction here. Declining supplemental jurisdiction would facilitate judicial economy, and although discovery has been ongoing for several months in this case, the court

does not believe it would unduly inconvenience or prejudice the parties at the current stage of litigation.  The comity factor also weighs in favor of declining supplemental jurisdiction. Crockett's VFAWPA and VTCA claims raise questions about whether those statutes waive Defendants' sovereign immunity, and Fourth Circuit precedent "evince[s] a strong preference that state law issues be left to state courts." *Arrington v. City of Raleigh*, 369 F. App'x 420, 423 (4th Cir. 2010).

For those reasons, the court will decline to exercise supplemental jurisdiction over Counts I and III and dismiss those counts without prejudice.

## IV.    Conclusion

For the reasons outlined above, the court will **GRANT** Defendants' motion to dismiss the amended complaint (Dkt. 11).  The court will **DISMISS** Counts II, IV, and V of the amended complaint **without prejudice**.  The court will decline to exercise supplemental jurisdiction over Counts I and III and will **DISMISS** those counts **without prejudice**.  The court will **GRANT** Crockett leave to amend.  If Crockett does not file an amended complaint within 21 days of the date of the court's accompanying Order, the court will dismiss this action with prejudice.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 18th day of September, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE

- 25 -