CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
April 23, 2026

LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| Nancy Crockett, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:24-cv-00084 |
| | ) | |
| Commonwealth of Virginia *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Nancy Crockett has served as a corrections officer in the Virginia Department of Corrections ("VDOC") for over four years. Beginning in September 2022, pursuant to her "roving" contract, she was assigned to work every other week at a short-staffed facility in Augusta County. One night, several months after starting her Augusta position, Crockett was directed to spend nine hours in a room being trained by a particular officer. That night, the officer was irate and aggressive. He repeatedly threatened to kill others at the facility, including Crockett. Crockett reported the behavior to her Augusta supervisors and other VDOC management. In the months following the incident, Crockett alleges that she was subjected to discrimination, retaliation, and harassment based on her sex and disabilities.

This matter is before the court on Defendants Commonwealth of Virginia ("the Commonwealth") and VDOC's second motion to dismiss. (Dkt. 47.) For the following reasons, the court will grant Defendants' motion to dismiss.

## I.    Background

### A. Factual History[1]

Crockett has worked as a corrections officer with VDOC since August 10, 2021. (Second Am. Compl. ¶ 6 (Dkt. 47) [hereinafter "SAC"].)  She currently serves as a Lead Corrections Officer and was an honor graduate of her academy class. (*Id.* ¶¶ 7–8.)  Crockett has received praise in her position and has never been written up or given a substandard rating. (*Id.* ¶¶ 9–10.)  Despite her professional success, she alleges that she has been treated differently and judged more harshly than her male counterparts. (*Id.* ¶¶ 11–12.)

#### 1. Roving at Augusta Correctional Center

Crockett was employed under a roving contract beginning on September 25, 2022. (*Id.* ¶ 13.)  Roving contracts, which typically span a six-month period, require the corrections officer to work outside of her "home facility" at short-staffed facilities in exchange for double pay. (*Id.* ¶¶ 14–16.)  Her home facility was River North Correctional Center in Independence, Virginia. (*Id.* ¶ 17.)  Under her September roving contract, Crockett repeatedly traveled to her assigned facility—Augusta Correctional Center in Augusta County, Virginia—which was almost three hours away from her home facility. (*Id.* ¶¶ 18–19.)  She worked there for seven days, returned home for seven days, and repeated this cycle. (*Id.* ¶ 15.)  Crockett roved at Augusta Correctional Center for over four months—from approximately September 25, 2022, through February 6, 2023. (*Id.* ¶ 18.)

---

[1] The facts in this section are taken from Crockett's second amended complaint and the attached exhibit. (Dkts. 47, 47-1.)  The court accepts the facts alleged in the second amended complaint and supporting exhibit as true when resolving the motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).

After Crockett arrived at Augusta Correctional Center, she received a series of comments regarding her being a woman. Sergeant Ryan Hall warned her that "because she was a woman, she should 'get out,'" and that "he would not let his wife work at the DOC, especially at Augusta." (*Id.* ¶ 20.) Crockett was further "informed" that: (1) Warden Newcomer, the warden at Augusta Correctional Center, only allowed the "'cute' women to work up front" and that Crockett would work at the back of the prison, (*id.* ¶ 21); (2) she was "under a magnifying glass because [she's] a female in the back of a man's prison," (*id.* ¶ 22); (3) she should not "show emotion or weakness," (*id.* ¶ 23); and (4) Warden Newcomer hated Crockett "because she was not Warden Newcomer's 'type,'" which was "little blondes," (*id.* ¶ 25).

At some unspecified time and location "[d]uring her employment,"[2] Crockett was helping distribute cereal to inmates alongside an unnamed male colleague. (*Id.* ¶ 26.) They had no milk to provide with the cereal, so Crockett's colleague said that he would retrieve some milk from the "chow hall." (*Id.*) As soon as the colleague left, "an inmate yelled, 'machine gun,' every tray slot opened, and each male began masturbating to make the 'milk.'" (*Id.*) The colleague had not actually gone to the chow hall; instead, he was "up in the control room laughing like crazy." (*Id.*)

2. February 2023 Incident with Officer Watkins

On February 1, 2023, Crockett was told that Officer Watkins would be training her in the "Master Control" room of the Augusta Correctional Center, which is where all the controls for the prison doors are located. (*Id.* ¶¶ 27–28.) Crockett did not request to be trained in

---

[2] Crockett does not specify whether this occurred at Augusta County Correctional or some other facility.

Master Control, nor did she disclose her prior work in Master Control at a different facility. (*Id.* ¶¶ 35–36.) Neither the rovers nor Watkins were typically assigned to Master Control. (*Id.* ¶¶ 34, 37.) When management, including Captain Burgandine, assigned Crockett to work with Watkins this particular evening, they knew that Watkins was "out of control" and had just arrived back to VDOC from "stress leave." (*Id.* ¶¶ 38, 40–41.) Crockett asserts that she was assigned to Master Control because she is a woman and "would not fight back" against him. (*Id.* ¶ 38.) There were only three women on shift that night, but there were thirty men. (*Id.* ¶ 39.)

Officer Watkins had a reputation for being a "hot head." (*Id.* ¶ 30.) There were several instances in which he exhibited violence but was not disciplined for his behavior, even after the prison received reports. (*Id.* ¶¶ 30–32, 164.) On the night of February 1, he had recently lost his field training officer ("FTO") status following his participation in "an event in which Officer Sprouse had cleaning chemicals put in his drink, ultimately resulting in Officer Sprouse being on anxiety and acid reflux medication." (*Id.* ¶ 29.) Crockett was unaware of this reputation and FTO status removal, but had seen Watkins in briefing previously. (*Id.* ¶¶ 29–31, 33.)

Officer Watkins arrived in Master Control in an "agitated" state. (*Id.* ¶ 43.) He said that "he was very angry about his paycheck" and that "either the bank or HR fucked up and shit is about to get real if it isn't fixed today." (*Id.*) Captain Burgandine stopped by and informed Watkins that a Human Resources ("HR") representative would be visiting to explain something, and that he "better act like he had got some sense." (*Id.* ¶ 44 (cleaned up).) Watkins turned to Crockett after the Captain left and said, "You are going to earn your money

tonight," then called her a "big girl" or "big bitch." (*Id.* ¶ 46.) Crockett asked Watkins what that meant. (*Id.* ¶ 47.) He responded, "Well, I didn't get a paycheck. I'm killing every one of you motherfuckers that are here tonight." (*Id.*)

Soon after, Lieutenant Scott visited Master Control, already aware that Watkins was upset. (*Id.* ¶ 45.) Later, HR representative Mary Eppard appeared and told Watkins that "if he would ever think about checking his emails, he would have known that his short-term was denied." (*Id.* ¶ 48.) She told him that the $300 paycheck he received that day was correct, that he was not receiving a check on February 16, and that he owed around $960 for insurance. (*Id.*)

Next, Captain Burgandine directed Watkins to report to Lieutenant Armstrong's office. (*Id.* ¶ 49.) When Watkins returned to Master Control about half an hour later, Crockett observed that he was even more visibly upset than before. (*Id.* ¶ 50.) Watkins told her that he had been "on short-term disability 'due to the stress this place is causing.'" (*Id.*) He then punched a logbook and paced back and forth. (*Id.*) He continued his threatening and violent statements for hours, including: "I'm killing everybody at this motherfucker"; "I'm killing the roving officers"; "They want me to train you, I'm killing them too"; "If they upset my fiancée, you know, it's over. When she finds out I can't make a car payment, I can't even make a car payment, it's over"; that Watkins was "the realest motherfucker here"; and that Watkins was "taking guns from Master Control and going on the ridge and 'picking one off at a time.'" (*Id.* ¶¶ 51–56, 58.)

Master Control is equipped with AR-15 rifles, shotguns, and rounds of ammunition. (*Id.* ¶¶ 57, 76.) Watkins walked over to where the guns were stored in Master Control—a box to which he had the keys, (*id.* ¶ 76)—and stated:

> The coolest thing is, I'm using the state's ammo, I'm going right up there on that ridge, I'm going to pick y'all off one at a time. The next paperwork I do is going to be my commissary sheet because I'm not cuffing up. If you think a prison was meant to keep people in, and I'm in control, I'll pick y'all off like rats. I'm killing every motherfucker here tonight.

(*Id.* ¶ 57.)

At one point, Sergeant Johnson entered Master Control. (*Id.* ¶ 59.) Watkins said directly to Johnson: "I'm killing all these motherfuckers tonight. Right, dude?" (*Id.*) Johnson "fist bumped and made plans to attend a rage room" with Watkins on Saturday. (*Id.* ¶ 60.) Johnson "did not address, correct, or prevent" Watkins from continuing these statements and threats. (*Id.* ¶ 61.) Instead, he left Crockett alone with Watkins. (*Id.* ¶ 62.) Crockett reported Watkins's harassment that night to Sergeant Johnson, Lieutenant Scott, and Captain Burgandine—both by calling them on the Master Control phone and by telling them when they were "passing by" Master Control. (*Id.* ¶ 63.) All three responded by saying something to the effect of, "that's just Watkins." (*Id.* ¶ 64.)

Later that evening, Johnson called and "sounded like he was crying." (*Id.* ¶ 65.) Crockett does not specify who he called or what he said. Watkins then ran out of Master Control and into the "Watch Room," returned several minutes later, then ran out again to "Front Entry." (*Id.*) When Crockett got her break, she told Officers Gideos and Wills about Watkins's behavior, including that he was threatening to kill everyone and threatening Crockett. (*Id.* ¶ 66.) These officers responded much like the other personnel—that Watkins

- 6 -

was just being Watkins and that he was "just blowing off steam." (*Id.*) The sergeants, lieutenants, and captains all responded to her reports by laughing and telling her she was "going to earn her money that night," and that this was "just Watkins." (*Id.* ¶ 78.)

Several hours after he had left for Front Entry, Watkins returned to Master Control, appearing calmer than before. (*Id.* ¶¶ 67, 69.) Sergeant Tharp later told Crockett that Watkins had gone home and "beat his significant other and told her that he'd kill her and her kids. (*Id.* ¶ 68.) Crockett also eventually heard, from an unspecified source, that Watkins had "abused his girlfriend so badly" that night "that she sought treatment in a psychiatric ward." (*Id.* ¶ 163.)

Immediately after Watkins returned, Lieutenant Scott called Watkins and told him that he was "drafted" to work overtime hours. (*Id.* ¶ 69.) Thus, Watkins resumed his "rage" and "threats about killing everyone," now telling Crockett that he had enough weapons in his car, home, and Master Control to kill them all. (*Id.* ¶¶ 70–71.)

That night, Crockett was in Master Control with Watkins for nine total hours. (*Id.* ¶ 75.) Crockett was "scared to death," but afraid to cry, as "Warden Newcomer viewed crying as a security risk." (*Id.* ¶¶ 72–74.) She "felt like a hostage." (*Id.* ¶ 75.) Watkins had access to the guns stored in Master Control, but Crockett had no items of protection. (*Id.* ¶¶ 76–77.)

3. VDOC Response to Watkins Incident

The next day, February 2, Crockett was instructed to return to Master Control for another shift. (*Id.* ¶ 79.) She asked the captain on shift if she could work in her building instead, as she was afraid to go back. (*Id.* ¶ 80.) The captain was aware of what had happened in Master Control the night before, but responded by "bark[ing] at [] Crockett, 'are you

refusing post?'" (*Id.* ¶ 81.) Crockett requested to have someone else work and train with her and explained that she "could not" go back into Master Control with Watkins. (*Id.* ¶ 82.)

But Crockett ultimately went to Master Control for her shift that day. (*Id.* ¶ 83.) Because of the incident night before, Crockett had not received training on how to run Master Control. (*Id.* ¶ 84.) She reached out to Captain Burgandine and Lieutenant Scott to ask for assistance. (*Id.*) They both "gave [her] pushback, indicating that she should be able to run it, and sent only very minimal help." (*Id.*)

That same day, Crockett reported Watkins's threats of violence to Sergeant Floyd. (*Id.* ¶ 85.) She described to Floyd how she had reported the threats to the supervisory personnel—Johnson, Scott, and Burgandine. (*Id.* ¶¶ 85–86.) Floyd asked Crockett if the personnel had asked her to write a report or statement, and she confirmed that they had not. (*Id.* ¶ 86.) Floyd instructed Crockett to refrain from saying anything more about the incident until she was at her home facility of River North, at which point she should report the incident again. (*Id.*) A female sergeant then cautioned Crockett to "be so careful" as a female and remarked that Investigator Lokey, Johnson, Actin, and Watkins were "all tight." (*Id.* ¶ 87.) She noted that she was the only female sergeant at Augusta County Correctional. (*Id.*) On the same day, Crockett was also informed that management was going to report the harassment as required by law and policy. (*Id.* ¶ 88.)

During Crockett's night shift the following day—Friday, February 3 to Saturday, February 4—Sergeant Tharp asked her "why there was a running joke about her not working in Master Control anymore when [she] had agreed to be cross trained." (*Id.* ¶ 89.) Crockett began crying and described what had happened in Master Control. (*Id.* ¶ 90.) Tharp reported

the incident to Captain Arnold and Lieutenant Curtis, who responded by asking Crockett where her reports to supervisors from the night of the incident were. (*Id.* ¶¶ 91–92.) She explained that she did not know where physical reports were located, but that she reported the incident to her immediate chain of command. (*Id.* ¶ 92.)

On Sunday night, February 5, Crockett was directed for the first time to write a statement. (*Id.* ¶¶ 93–99.) Previously, Crockett had been repeatedly warned to keep things "in the department" and avoid writing a "truthful statement identifying negative behavior" at VDOC—especially as a female. (*Id.* ¶ 100.) Warden Newcomer gave Crockett one hour to write her statement and did not allow her to leave the Watch Office in the meantime. (*Id.* ¶ 99.) Newcomer acted aggressively towards Crockett. (*Id.* ¶ 101.) Crockett asked Newcomer, "Why are you not talking to your supervisors that I reported this to? Why are you talking to me like this?" (*Id.*) Crockett further related to Newcomer that she had not slept for four days and wanted to speak to Warden David Anderson, the warden at her home facility. (*Id.* ¶ 102.)

Crockett spoke to Anderson on the phone, in front of an Augusta lieutenant and captain, about how "she was held hostage by a disgruntled employee and after she reported it, nothing was done." (*Id.* ¶¶ 103–05.) She explained that Newcomer was now "trying to force her to give a written statement." (*Id.* ¶ 105.) In response, Anderson instructed the management present to keep Crockett safe. (*Id.* ¶ 106.) He stated to them, "I don't know what you have going on at that prison, she is one of our top officers." (*Id.* ¶ 108.) They responded that Crockett "had no issues during her time at Augusta Correctional Center." (*Id.*

¶ 109.)  Anderson also told Crockett, "I want you to get the fuck out of there."  (*Id.* ¶ 107.)

He said she should give a statement to SIU Investigator Shaun McDaniel.  (*Id.* ¶ 110.)

Crockett wrote and submitted a statement that night in the presence of Lieutenant

Curtis.[3]  (*Id.* ¶ 111.)  Because she "had cried to the point that she could not be around

inmates," Crockett needed to leave.  (*Id.* ¶ 112.)  She requested that a car be sent for her, but

ultimately, her husband picked her up from the prison.  (*Id.* ¶¶ 113–14.)  When she called

Anderson after leaving the facility, he told her to go home, get some sleep, then report to River

North the next day.  (*Id.* ¶ 115.)

Crockett went to Anderson's office the next morning, February 6, to meet with him

and the assistant warden.  (*Id.* ¶ 116.)  Anderson asked her to recount what had happened.  (*Id.*

¶ 117.)  He also asked Crockett "what it would take to make her happy," what she "wanted

out of this," and "what it would take for her to keep this quiet."  (*Id.*)  Crockett replied that

she only wanted to keep the same hours and pay.  (*Id.* ¶ 118.)  When Anderson emphasized

that she was making more money than the wardens, Crockett explained that she took on the

"tough" roving lifestyle for the money.  (*Id.* ¶ 119.)  The meeting ended with Anderson

expressly permitting Crockett to work at River North while the incident was under

investigation.  (*Id.* ¶ 120.)  After Crockett left Anderson's office on February 6, she sought

medical attention and was diagnosed with PTSD.  (*Id.* ¶ 121.)

Eventually, Crockett spoke with SIU Investigator Shawn McDaniel.  (*Id.* ¶ 122.)  He

informed Crockett that if Watkins had "been dealt with the first few times," she "would have

---

[3] The SAC does not specify whether this February 5 statement was submitted to Augusta County Correctional Center, SIU Investigator Shaun McDaniel, or both.

never gone through this." (*Id.*) He expressed that he was sorry she had experienced the reported incident. (*Id.*) His investigation concluded on March 14, 2023. (*Id.* ¶ 123.)

Following the investigation, Anderson notified Crockett that Newcomer would only approve of one solution to the incident. (*Id.* ¶ 124.) Specifically, Newcomer agreed to (1) never allowing Crockett to work at Augusta Correctional Center while Newcomer is Warden, and (2) only allowing Crockett to rove at the Sussex I facility if she wanted to keep her higher roving salary. (*Id.*) Sussex I is five hours away from Crockett's home and, according to Crockett, is "the worst correctional center in Virginia," as "it's a gang prison, being run by gang members." (*Id.* ¶¶ 124–25 (cleaned up).) Anderson advised Crockett to stay at River North, as it was the safest option. (*Id.* ¶ 125.) But remaining at her home facility would require Crockett to face a pay cut of almost $50,000 per year. (*Id.*)

Crockett asked if she could rove at the Greensville facility. (*Id.* ¶ 126.) Anderson refused because, according to him, Newcomer "would only agree to her continuing to rove if it was at Sussex I." (*Id.*) Crockett states that she was "banned" from the Augusta Correctional Center "due to her reaction to being held hostage and assaulted," and that Newcomer attributed her reaction to the fact that Crockett was a woman. (*Id.* ¶ 131.) In fact, Anderson said that Newcomer told him that "as long as Warden Newcomer was Warden at Augusta Correctional Center, [] Crockett was never allowed back on the property." (*Id.* ¶ 138.) To justify this prohibition, Newcomer falsely stated that Crockett had "received a substandard." (*Id.* ¶ 148.) Crockett maintains that she has never been "issued a substandard." (*Id.*)

None of the supervisors from the February incident were disciplined for failure to report. (*Id.* ¶ 161.) Rather, the "solution," chosen at a supervisors meeting by Newcomer, was to send Crockett away. (*Id.* ¶ 162.)

4. Roving Program Change

To keep the roving pay, Crockett decided to try working at Sussex I. (*Id.* ¶ 127.) She finished her September roving contract by serving at Sussex I from March 6 through March 24, 2023. (*Id.* ¶ 128.) Crockett received a new six-month roving contract, which began on March 25, 2023, at Sussex I. (*Id.* ¶ 129.) But in May 2023, Crockett was notified of a change to the roving program, which prevented correctional officers from roving outside of "their region." (*Id.* ¶ 130.) Sussex I was outside of Crockett's assigned region, and the only correctional center available for roving in Crockett's region was Augusta Correctional Center. (*Id.* ¶ 131.)

Crockett called Regional Manager Roger Walz after learning of the program change. (*Id.* ¶ 132.) She also met with Warden McCoy at Sussex I on various occasions, called the HR representative Dana Harty, and called Western Regional Administrator Lisa Hernandez, all in an effort to continue roving. (*Id.* ¶¶ 133–34.) HR assured her that she could remain at Sussex I given the Augusta Correctional Center incident, and that they would make an exception to the policy for her circumstances. (*Id.* ¶ 135.) They also explained that VDOC was so understaffed that they would not prevent her from roving. (*Id.*)

However, in June 2023, Crockett was informed that she was not being given a roving contract. (*Id.* ¶ 136.) Accordingly, her yearly pay was cut by approximately $50,000. (*Id.*) At the time VDOC terminated her from the roving program, the east region was short

approximately 60 officers. (*Id.* ¶ 137.) Warden McCoy said that the decision to disallow Crockett from working at Sussex I "came directly from Warden Newcomer" at the wardens' meeting, despite McCoy attempting to speak up for Crockett. (*Id.* ¶ 139.)

Also in June, Crockett spoke with Hernandez, who was Newcomer's supervisor, and reported gender discrimination and retaliation for her reaction to Watkins's behavior. (*Id.* ¶¶ 141, 149.) By then, she had been working at VDOC for almost two years, with perfect attendance, graduation with honors, and no disciplinary issues, unlike the other individuals who received roving contracts. (*Id.* ¶ 141.) All other officers from the western region who had been roving at Sussex I when the policy changed, except for Crockett, were simply moved back to Augusta Correctional Center. (*Id.* ¶ 143.) Hernandez replied that it was Newcomer, Walz, and the Augusta team who had rejected her roving contract request. (*Id.* ¶ 144.)

But Crockett has since learned that Walz was not a decisionmaker, and that it was Newcomer. (*Id.* ¶¶ 145–46.) Crockett was also "informed directly" by an unspecified source that she was "not recommended for a roving contract at Augusta because of the incident that occurred in February 2023," which "Warden Newcomer apparently thought was caused by [] Crockett being female." (*Id.* ¶ 147.) She was "simultaneously informed" that "Anderson speaks highly of her and believes she has a 'bright future with the VADOC.'" (*Id.*)

After learning of the roving contract denial and reporting these issues to Hernandez, Crockett offered "to do anything to keep the extra pay." (*Id.* ¶ 149.) Still, VDOC did not allow her to stay at Sussex I with roving pay. (*Id.* ¶ 150.) Crockett then asked to "do anything to keep the seven [days] on/seven [days] off schedule, because that was what her body had

adjusted to." (*Id.* ¶ 152.) Subsequently, VDOC moved Crockett to Cold Springs Correctional Unit in early July 2023. (*Id.* ¶ 153.)

Only two weeks after she was assigned to Cold Springs, Crockett was "drafted" to work at Augusta Correctional Center for a week. (*Id.* ¶ 154.) Now, Newcomer did not contest Crockett working there for normal pay under a draft. He only opposed her making extra pay either through roving or overtime and "indicated that [she] would never be approved for overtime" at Augusta. (*Id.* ¶¶ 155–56.) Before she left for Augusta, Superintendent Redmond at Cold Springs told Crockett that he thought Newcomer would send her back to Cold Springs. (*Id.* ¶ 158.) If so, Redmond said that he would tell Newcomer that "he does not get to pick his officers." (*Id.*)

Crockett reported to Augusta Correctional Center that week. She "received a lot of attention," and was told "she was there because she had been flagged as a different Crockett." (*Id.* ¶ 159.) She was also told that people believe that she "snitched" because she is female, and that she has been nicknamed the "snitch bitch" at VDOC. (*Id.* ¶ 165.)

In addition to her PTSD diagnosis, Crockett was diagnosed with complex PTSD and panic disorder "[d]ue to the events [she] has endured." (*Id.* ¶ 166.) She often fell ill from stress. (*Id.* ¶ 168.) She stopped sleeping and partaking in her hobbies or non-work activities, and in August 2023, Crockett suffered PTSD disassociation. (*Id.*) For two months following her breakdown, she took short-term disability leave but returned to work in October 2023. (*Id.* ¶¶ 169–70.)

- 14 -

In November 2023, Newcomer was moved to a new prison.  (*Id.* ¶ 140.)  Crockett received information from an unidentified source alleging that his move was related to how he treats women.  (*Id.*)

### 5.  January 2024 EEOC Charge

On January 10, 2024, Crockett filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging gender discrimination, sexual harassment, and retaliation.  (*Id.* ¶ 171.)  She disclosed her diagnoses of PTSD, complex PTSD, and panic disorder.  (*Id.*)  She also provided a Preservation of Evidence Letter to VDOC, which directed VDOC to notify a number of individuals of Crockett's claims and need for preservation, including Watkins, Anderson, Newcomer, McDaniel, Hernandez, Burgandine, Johnson, Tharp, and several others.  (*Id.* ¶ 173.)  Newcomer learned of the EEOC filing in January 2024.  (*Id.* ¶ 172.)

### 6.  Fluvanna Incidents in 2024 and 2025

Crockett began participating in the "Fluvanna Transportation Team Pilot Program in July 2024.  (*Id.* ¶ 174.)  That same month, she was "held in a sallyport without cause."[4]  (*Id.* ¶ 175.)  Crockett immediately reported this incident and explained how she needed to be let out because of her PTSD.  (*Id.*)  Still, Crocket was not released from the sally port.  (*Id.*)

At some unspecified time, Crockett filed "ADA accommodation requests" for (1) psoriasis, which required that she wear cotton instead of polyester uniforms; (2) PTSD, which meant she must avoid tight spaces; and (3) migraines, meaning she had to wear glasses.  (*Id.* ¶ 176.)  In February 2025, new leadership transferred into Fluvanna from Augusta.  (*Id.* ¶ 177.)

---

[4] A sally port is "a secure entryway (as at a prison) that consists of a series of doors or gates."  Sally port Definition, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/sally%20port (last visited Apr. 17, 2026).

Thereafter, Crockett was harassed about her cotton uniform and glasses, even though other officers were wearing exactly the same uniform as Crockett or wearing glasses. (*Id.* ¶¶ 180–81.) Crockett identifies Major Stokes as an individual who transferred to Fluvanna from Augusta and subsequently harassed Crockett. (*Id.* ¶¶ 177–78.)

Other forms of harassment included being told that if she "thought about being bisexual, it may be easier for her." (*Id.* ¶ 182.) Crockett also complained that she was assigned to work in a special housing unit, RHU, even though she had signed up to be a transportation officer. (*Id.* ¶ 179.) She characterizes RHU as a "much rougher position" because it involves misbehaving inmates. (*Id.*)

Crockett reported harassment and retaliation to HR on four separate occasions. (*Id.* ¶ 183.) Each time, she was "turned away" and "told that the harassment and retaliation should be handled in-house instead of through grievances." (*Id.* ¶ 184.) She then tried calling HR at her home facility, but they said, "Don't waste your time calling in here anymore. All you are is a personnel file." (*Id.* ¶ 185.) Crockett heard the HR representative refer to her as a "bitch" when they were unaware Crockett was on the phone line. (*Id.* ¶ 186.)

On April 9, 2025, Crockett "ended up at UVA having a panic attack" and sought care due to "the treatment she was enduring at work." (*Id.* ¶ 187.) She had another panic attack at work on April 21, 2025, after she suffered harassment for "trying to grieve the lack of disability accommodation[s]" for the uniform and glasses. (*Id.* ¶ 189.) She tried to visit with the warden about these issues but "was shut down." (*Id.*) Crockett's panic attacks cause an unsafe rise in her blood pressure, the feeling of a heart attack, loss of control of her bowels and bladder, and profuse vomiting. (*Id.* ¶ 188.)

As a result of the harassment, Crockett sought and transferred back to Cold Springs from Fluvanna. (*Id.* ¶ 190.) Upon her return, she found that Cold Springs was "now staffed by approximately 70% of the prior workers from Augusta, and the officers were staying in touch with Warden Newcomer." (*Id.* ¶ 191.) She was told that she could not speak to the night shift there. (*Id.* ¶ 193.) Thus, the harassment worsened at Cold Springs, which led Crockett to experience another panic attack around May 2025. (*Id.* ¶¶ 192, 194.) She left for short-term disability leave around May or June 2025, and she was still on disability leave at the time the SAC was filed in October 2025. (*Id.* ¶¶ 195–96.) She struggles to even leave her home. (*Id.* ¶ 197.)

**B. Procedural History**

Crockett filed a Charge of Discrimination with the EEOC on January 10, 2024, alleging gender discrimination, sexual harassment, and retaliation. (*Id.* ¶¶ 5, 171.) On April 30, 2024, she filed a complaint in the Circuit Court for Augusta County against Defendants VDOC, the Commonwealth, David Newcomer, and Roger Waltz. (*See* Dkt. 4-1 at 2–15.) Several months later, on July 26, 2024, she received a Notice of Right to Sue from the EEOC. (SAC ¶ 5; *see* Dkt. 47-1.)

Crockett moved to amend her original state court complaint on August 16, 2024, (Dkt. 4-1 at 95–96), and the circuit court judge granted the motion on August 21, 2024, (*id.* at 119–20). Defendants were served with the amended complaint on September 26, 2024. (Dkt. 1 ¶ 2.) Crockett's amended complaint alleged five counts under the Virginia Fraud and Abuse Whistle Blower Protection Act, Section 504 of the Rehabilitation Act of 1973, the Virginia Tort Claims Act, and Title VII of the Civil Rights Act of 1964. (Dkt. 4-1 at 108–15.)

Defendants timely removed the action to the U.S. District Court for the Western District of Virginia on October 16, 2024. (Dkt. 1.) On November 6, 2024, Defendants moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). (Dkt. 11.) After reviewing the amended complaint and motion to dismiss briefs, (Dkts. 12, 13, 14), on September 18, 2025, the court issued a memorandum opinion and order granting Defendants' motion to dismiss, (Dkts. 44, 45). The court concurrently granted Crockett leave to amend her complaint within 21 days. (Dkt. 45 at 1.)

Crockett timely filed her second amended complaint ("SAC") on October 9, 2025. (Dkt. 47.) The SAC only names the Commonwealth of Virginia and Virginia Department of Corrections as the defendants,[5] and does not allege any of the state statutory claims included in the first amended complaint. (*Id.* at 1, ¶¶ 198–222.) It also introduces new factual allegations and claims based on events from July 2024 through June 2025. (*Id.* ¶¶ 174–197.) In the SAC, Crockett alleges three causes of action. (*Id.* ¶¶ 198–222.) Count I includes claims of discrimination, failure to accommodate, and retaliation in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. (*Id.* ¶¶ 198–208.) Count II alleges gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. (*Id.* ¶¶ 209–14.) Count III alleges a violation of Title VII's antiretaliation provision. (*Id.* ¶¶ 215–22.)

On October 23, Defendants moved to dismiss the SAC for failure to state a claim upon which relief can be granted. (Dkts. 49, 50.) Crockett responded in opposition on November

---

[5] Accordingly, the previously named defendants, David Newcomer and Roger Waltz, have been dismissed from the suit. *See Sanford v. Virginia*, No. 3:08-cv-00835, 2009 WL 2707434, at *3 (E.D. Va. Aug. 26, 2009).

5. (Dkt. 55.) After the court granted an extension of time to file, (Dkt. 59), Crockett replied on November 14. (Dkt. 60.)

## II. Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Such motions do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). Accordingly, to survive a Rule 12(b)(6) motion to dismiss, a plaintiff need only plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

In reviewing and ruling on a motion to dismiss, the court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). The court's review is generally limited to the complaint itself, in addition to documents attached to the complaint or explicitly incorporated into the complaint by reference. Fed. R. Civ. P. 12(d), 10(c); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

## III.    Analysis

### A. Section 504 of the Rehabilitation Act (Count I)

For her disability-based claims, Crockett reiterates her first amended complaint's assertions that Defendants are liable for discrimination and retaliation in violation of Section 504 of the Rehabilitation Act. (*See* SAC at 23–24.) She also adds a Section 504 "failure to accommodate" claim. (*See id.*) The court will address each of Crockett's discrimination, retaliation, and failure to accommodate claims in turn.

### 1.   Discrimination

To prove a claim of discrimination under Section 504, a plaintiff must show that: "(1) she is disabled; (2) she was otherwise qualified for the position; and (3) she suffered an adverse employment action solely on the basis of her disability." *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019); *see* 29 U.S.C. § 794(a). Crockett need not prove these *prima facie* case elements at this stage. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002). Still, she is required to plead facts sufficient to "raise a right to relief above the speculative level." *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555); *see Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). To allege a Section 504 discrimination claim, Crockett must plead facts that allow the court to draw the reasonable inference that she suffered discrimination "solely by reason of her . . . disability." 29 U.S.C. § 794(a).

In the SAC, Crockett alleges several disabilities that were not included in her first amended complaint; in addition to PTSD, complex PTSD, and panic disorder, she also suffers from psoriasis and migraines. (SAC ¶ 200.) Crockett adds details about when she was

- 20 -

diagnosed with these disabilities and when she made Defendants aware of them. (*See id.* ¶¶ 121, 171, 176.)  She also broadens her claim.  Instead of only identifying Defendants' refusal to renew her roving contract as the "adverse employment action," (Am. Compl. ¶ 95 (Dkt. 1-2)), she now alleges that, "[a]fter learning of [] Crockett's disabilities, the Commonwealth of Virginia and Virginia Department of Corrections harassed Ms. Crockett solely because of her disabilities and failed to accommodate her disabilities."  (SAC ¶ 203.)  Defendants contend Crockett's SAC still does not contain enough facts to raise a plausible inference that she suffered adverse actions *solely* because of her disabilities.  (Defs.' Br. at 3–7 (Dkt. 50).)  The court agrees that, even with Crockett's new allegations, her SAC does not state a Section 504 discrimination claim.

First, any potential "adverse employment actions" that predate Defendants' knowledge of Crockett's disabilities cannot support a claim that Defendants took such action solely because of her disabilities.  *See Blackmon v. Spahn*, No. 22-cv-01185, 2023 WL 5804275, at *9 (D. Md. Sept. 7, 2023), *aff'd*, No. 23-2260, 2025 WL 1024388 (4th Cir. Apr. 7, 2025) (holding that a Rehabilitation Act discrimination claim "fails as a matter of law because the supposed adverse employment actions all predated the disclosure of her condition to the Agency"); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) ("[T]he defendant cannot discriminate 'because of' a disability if it has no knowledge of the disability.").  Crockett specifies that she was diagnosed with PTSD on February 6, 2023, (SAC ¶ 121), but does not allege that Defendants knew about any of her disabilities until on or after January 10, 2024, when she filed an EEOC charge, (*id.* ¶ 171).  The charge—which disclosed that she has PTSD, complex PTSD, and panic disorder—was sent to VDOC in January 2024, along with the Preservation

of Evidence letter. (*Id.* ¶ 173.) Thus, to the extent that Crockett's Section 504 discrimination claim is based on potential adverse actions taken *before* January 2024, such claims must fail.

Crockett also alleges that she "put her ADA accommodation requests on file related to her psoriasis . . . , PTSD . . . , and migraines," but does not include which actors, if any, learned of these conditions. (*Id.* ¶ 176.) Although Crockett does not specify when she requested the ADA accommodations, it appears that the request occurred sometime before February 2025, when leadership moved from Augusta to Fluvanna. (*See id.* ¶¶ 177, 180–81 (alleging that Ms. Crockett "was accommodated [with uniforms and glasses] until Augusta leadership moved to Fluvanna").)

Crockett also does not clarify which actions of "harassment" she is alleging constitute "adverse employment actions" that Defendants took because of her disability. The actions that allegedly occurred *after* Defendants became aware of her PTSD, complex PTSD, and panic disorder were: (1) the sally port incident, (*id.* ¶ 175); (2) Crockett's placement in a special housing unit rather than the transportation officer position that she signed up for, (*id.* ¶ 179); (3) harassment about her uniform and glasses, (*id.* ¶¶ 180–81); (4) the comment about her being bisexual, (*id.* ¶ 182); (5) HR turning her away, telling her to handle her issues in-house, and calling her a "bitch," (*id.* ¶¶ 183–86); (6) "being harassed about trying to grieve the lack of disability accommodation" for her uniform and glasses in April 2025, (*id.* ¶ 189); and (7) unspecified "harassment" at Cold Springs that included being told Crockett could not speak to the night shift members, (*id.* ¶¶ 192–93).

The Rehabilitation Act requires a plaintiff to allege an "adverse employment action" that adversely affected the "terms, conditions, and privileges of employment." *Herkert v.*

*Bisignano*, 151 F.4th 157, 164–65 (4th Cir. 2025) (quoting 42 U.S.C. § 12112). As courts have found, a plaintiff's "allegations of general harassment do not sufficiently constitute an adverse employment action because they did not affect the terms and conditions of her employment."[6] *Anthony v. Alexandria City Pub. Schs.*, No. 1:22-cv-00107, 2022 WL 2541914, at *6 (E.D. Va. July 7, 2022); *see Bailey v. Virginia Dep't of Alcoholic Beverage Control*, No. 2:18-cv-00392, 2019 WL 2590796, at *4 (E.D. Va. Apr. 25, 2019) ("Generally, inappropriate and even extreme conduct by co-workers towards a plaintiff or a failure to take certain actions by supervisors is alone insufficient to find an adverse action because there still must be a material change in the terms, conditions, and benefits of the plaintiff's employment.").

The court recognizes that Defendants do not explicitly assert in their initial motion to dismiss brief that Crockett fails to allege an "adverse employment action" under the Rehabilitation Act. (*See* Defs.' Br. at 3–7.) Still, they point out that Crockett alleges two "adverse employment actions"—"the non-renewal of the roving contract and refusal to allow Plaintiff to rove at Augusta Correctional Center." (*Id.* at 4.) After discussing the alleged harassment in 2024 and 2025, they argue that "[t]he SAC does not clearly allege that Plaintiff was excluded from employment, denied benefits, or otherwise suffered an adverse employment action solely because of disability." (*Id.* at 6.) Therefore, the court will address Plaintiff's failure to sufficiently allege adverse employment actions.

The sally port incident, harassment about Crockett's glasses and uniform, comment about her sexuality, harassment at Cold Springs, and HR's responses do not, as a matter of

---

[6] As the court explained in its first memorandum opinion, "courts routinely rely on Title VII precedent in ADA cases, and the Rehabilitation Act expressly incorporates ADA standards." *Herkert*, 151 F.4th at 164 (citations omitted).

law, allege an adverse employment action.  *See Munday v. Waste Mgmt. of N.A., Inc.*, 126 F.3d

239, 243 (4th Cir. 1997) (holding as a "matter of law" that a supervisor "yelling at [the plaintiff],

directing other employees to ignore her and to spy on her, and generally refusing to

communicate with her concerning her employment-related complaints" did not "not rise to

the level of an adverse employment action for Title VII purposes"); *Iwebo v. Sheppard Pratt

Health Sys., Inc.*, No. CV BPG-19-3008, 2020 WL 4748579, at *5 (D. Md. Aug. 14, 2020)

(finding that the plaintiff "fails to allege [Title VII] adverse actions with regard to the alleged

denial of plaintiff's accommodation request, the directive for plaintiff to take extended leave

or work in another unit, and the harassment and attempted firing by the shift coordinator").[7]

Even if the court were to assume all the alleged harassment constituted adverse action,

Crockett has not plausibly alleged that her disabilities were the sole basis for any one of these

incidents.  First, she does not provide any facts tending to show that the decision to detain her

in a sally port was carried out solely based on her disabilities.  She does not even allege that

the officers involved in this incident were aware of her PTSD or other disabilities *before*

initiating the detention.  Instead, she states that she "reported contemporaneously with the

detention that she needed to be let out as she had PTSD" but that she was not released.  (*Id.*

¶ 175.)  This vague allegation, in which she does not specify how and to whom she "reported,"

is not enough to plausibly state that this event was an adverse employment action taken solely

on the basis of disability.  Further, Crockett argues that Defendants knew about her disabilities

---

[7] Crockett also alludes to a claim of constructive discharge in her response brief.  (Pl.'s Br. at 19–20.)  However, the SAC
does not clearly allege constructive discharge.  Crockett may not amend her complaint through a response brief.  *See Azimi
v. Bunch*, No. 3:25-cv-00020, 2025 WL 2988469, at *2 n.3 (W.D. Va. Oct. 23, 2025) (citing *S. Walk at Broadlands Homeowner's
Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013)).  In any event, "taking medical leave does
not amount to a resignation."  *High v. Wells Fargo Bank*, No. 3:21-cv-00081, 2023 WL 2505540, at *11 (E.D. Va. Mar. 14,
2023); *see Clehm v. BAE Sys. Ordnance Sys., Inc.*, 291 F. Supp. 3d 775, 791 (W.D. Va. 2017).

before the detention because "she put her disabilities . . . on record with" VDOC.  (Pl.'s Br. at 17 (Dkt. 55).)  But Crockett does not provide any specific date on which she submitted such reports,[8] nor does she allege which individuals saw the record and knew about her disabilities prior to this incident.

Second, for the allegations of harassment about Crockett's cotton uniform and glasses, (*id.* ¶¶ 180–81), Crockett does not even state who perpetrated the harassment, much less whether they knew about her psoriasis, migraines, or other alleged disabilities.  Thus, she does not plausibly allege that her disabilities had any role in causing this vague "harassment."

Next, for her alleged HR interactions, Crockett does not specify whether these interactions occurred before or after she had submitted her accommodation requests.[9] Indeed, the SAC does not indicate the date or recipient(s) of the accommodation requests. Nor does it contain the timing, individuals involved, or topics discussed in Crockett's four attempted conversations with HR about "harassment and retaliation."  (*Id.* ¶ 183.)  Even assuming HR had knowledge of the disabilities, Crockett does not allege facts suggesting that the department's actions in response to her "harassment and retaliation" complaints were made solely based on her disability.  She does allege that she had a panic attack in April 2025 "after being harassed about trying to grieve the lack of disability accommodation for her uniform . . . and her glasses," which suggests that this unidentified harasser knew that she had disabilities. (*Id.* ¶ 189.)  Yet still, this vague statement does not provide facts giving rise to a

---

[8] In fact, the order of Crockett's allegations in her SAC suggest that the sally port incident occurred before she "put her ADA accommodation requests on file."  (SAC ¶¶ 175–176.)
[9] Crockett does not allege that the Charge of Discrimination filed in January 2024 and the included report of her PTSD, complex PTSD, and panic disorder was communicated to these HR representatives.  (SAC ¶ 173.)

plausible inference that this unspecified harassment was an adverse employment action taken solely because of her disabilities.

Finally, Crockett makes no factual allegations about how her disabilities played any role in the special housing unit decision, the comment about her being bisexual, HR's name-calling and refusal to help, or her vague allegation of harassment at Cold Springs in April or May of 2025.  Taking all Crockett's factual allegations as true, she does not sufficiently allege discrimination under the Rehabilitation Act.

i.   *Hostile Work Environment*

A plaintiff may allege discrimination under Section 504 based on a hostile work environment theory.   "To establish a case for hostile work environment under the Rehabilitation Act, the plaintiff must prove: (1) unwelcome conduct; (2) resulting because of her disability; (3) which is sufficiently severe or pervasive to alter plaintiff's conditions of employment; and (4) which is imputable to the employer."  *Gearhart v. Dep't of Veterans Affs.*, No. 7:19-cv-00370, 2022 WL 4594037, at *10 (W.D. Va. Sept. 30, 2022).  The "severe or pervasive" prong is a high bar.  *See id.*  Unwelcome conduct must exceed "rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor."  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) (citations omitted).  "A hostile workplace is one so permeated with discriminatory intimidation, ridicule, and insult it alters the conditions of the victim's employment and creates an abusive working environment."  *Gearhart*, 2022 WL 4594037, at *10 (cleaned up).

In her response brief, Crockett asserts that Count I includes a hostile work environment claim under the Rehabilitation Act.  But the SAC does not explicitly address a single element of a hostile environment claim in its Count I section.  (SAC ¶¶ 198–208.)  In fact, Crockett only uses the term "hostile work environment" *once* in the entire SAC, and only in the context of *sex* discrimination.  (*Id.* ¶ 84.)  Thus, the court will not fault Defendants for omitting a comprehensive argument against a Count I hostile work environment claim in their initial memorandum.  *See Villaras v. Geithner*, No. CIV. JFM 08-2859, 2009 WL 3418574, at *7 (D. Md. Oct. 20, 2009).  In their reply brief, Defendants explicitly respond to this claim.  (*See* Defs.' Reply at 3–4 (Dkt. 60).)

Even if the court considers the SAC to include a hostile work environment claim under Section 504, it will nevertheless dismiss this claim.  First, for the reasons expounded in the preceding subsection analyzing the Section 504 disability discrimination claim, Crockett does not adequately allege facts showing that any of the harassment alleged in the complaint was carried out because of her disabilities.  The "unwelcome conduct" forming the basis of the hostile work environment claim is limited to the incidents after January 10, 2024, the first time she alleges that she informed any VDOC personnel of her disabilities.  And for any incidents occurring after January 10, the SAC lacks factual allegations suggesting that harassment *resulted from* Crockett's disabilities.

Second, even if the alleged harassment at Fluvanna and Cold Springs occurred because of her disability, Crockett's allegations, accepted as true, are not sufficiently severe or pervasive.  Her harassment allegations are largely conclusory and vague.  She generally does not identify the actors involved in the post-January 2024 incidents, except for the brief

mention that she was "harassed by Major Stokes." (SAC ¶ 178.) Moreover, Crockett repeats throughout the SAC that she was "harassed," but often does not explain what actions were taken to harass her. The incidents that she does provide more detail for—the sally port incident, the HR call, and the bisexual comment—are more aptly characterized as "rude treatment from co-workers," "offhand comments, and isolated incidents." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) (citation omitted). Overall, the factual allegations are insufficient to raise a plausible inference of an "abusive working environment" that is "permeated with" disability discrimination. *Gearhart*, 2022 WL 4594037, at *10 (citation omitted).

Because Crockett does not allege sufficient facts to support her discrimination claim under a hostile work environment theory or a traditional discrimination framework, the court will grant Defendants' motion to dismiss as to the discrimination element of the Section 504 claim.

2. Retaliation

The Rehabilitation Act incorporates the anti-retaliation provision found in the Americans with Disabilities Act ("ADA") Amendments Act, which prohibits "discrimination against any individual because she has opposed any act or practice made unlawful by" the ADA Amendments Act. 42 U.S.C. § 12203(a); *see Walker v. Maryland Dep't of Info. & Tech.*, No. CV CCB-20-219, 2020 WL 6393435, at *6 (D. Md. Nov. 2, 2020). In evaluating a claim for retaliation in the absence of direct evidence, the court looks at whether: "(1) plaintiff engaged in protected activity, such as filing an EEO complaint; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected

activity and the adverse action." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 272 (4th Cir. 2001) (quoting *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998)); *see Sims v. Univ. of Maryland Med. Sys. Corp.*, No. CV CCB-19-0295, 2019 WL 6718053, at *5 n.16 (D. Md. Dec. 10, 2019) ("Although the plaintiff need not make out a *prima facie* case at the motion to dismiss stage, the Fourth Circuit has considered the elements of a prima facie case in determining whether the plaintiff has plausibly stated a claim." (citing *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010))). "Protected activities [under a Section 504 claim] are those statutorily protected under the ADA, including opposing or complaining about discrimination *based on disability*." *Smith v. Wormuth*, No. 1:20-cv-00419, 2024 WL 2881334, at *3 (D. Md. June 7, 2024) (emphasis added) (quoting *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 551 (7th Cir. 2017)).

First, it is unclear what Crockett asserts as "protected activity" for purposes of her Section 504 retaliation claim. In her response brief, she focuses on her attempts to talk to HR. (*See* Pl.'s Br. at 19–20.) Crockett only alleges that she "went to HR four times to talk about the harassment and retaliation," but "was turned away four times." (SAC ¶¶ 183–84.) Crockett does not actually allege that she reported anything at all, much less complained about discrimination based on her disability with HR. Nor does she specify when any of these attempted conversations occurred. She also states that "she tried to go see the Warden about" the lack of disability accommodation for her uniform and glasses, but "was shut down." (*Id.* ¶ 189.) This vague allegation does not convey whether she spoke to the warden about her disabilities—or spoke to him at all, for that matter. Because it is unclear whether her disability was even discussed with management, none of these interactions can constitute protected activity.

However, requesting disability accommodation is a protected activity under the Rehabilitation Act. *See Smith v. CSRA*, 12 F.4th 396, 415 (4th Cir. 2021); *Connelly v. Maryland Dep't of Hum. Servs.*, Civ. No. JKB-21-1068, 2021 WL 6000076, at *7 (D. Md. Dec. 20, 2021). Thus, Crockett's ADA accommodations requests for her PTSD, psoriasis, and migraines—made at some unspecified time—qualify as protected activity. (SAC ¶ 176.) Defendants argue that such requests still cannot serve as the basis for a retaliation claim, as the SAC does not allege that any requests "were denied or any adverse action taken by supervisors following those requests." (Defs.' Reply at 5; *see* Defs.' Br. at 6.) They also assert that the alleged adverse actions were unrelated to Crockett's protected activity. (*Id.*)

The court agrees that Crockett does not allege sufficient facts to support a finding that she faced harassment or other adverse action *because* she made accommodation requests. A plaintiff can allege causation by pleading (1) "that the adverse act bears sufficient temporal proximity to the protected activity," or (2) the existence of other facts suggesting "that the adverse action occurred *because of* the protected activity." *Smith*, 12 F.4th at 417 (emphasis added) (cleaned up); *Stewart v. Hegseth*, 800 F. Supp. 3d 662, 677 (W.D. Va. 2025) (considering these factors at the motion to dismiss stage). Crockett fails to plead temporal proximity. She does not provide a date or estimated time period for her accommodation requests, nor does she indicate the timing for most of the alleged harassment. *See Mamaril v. Lutnick*, No. CV 25-2010-BAH, 2026 WL 986443, at *6 (D. Md. Apr. 13, 2026) (dismissing the Rehabilitation Act retaliation claim under the causation prong because plaintiff did not "provide any information regarding the timing of his request for accommodation in order for the Court to reasonably infer causation based on temporal proximity").

Even if Crockett had alleged temporal proximity or proffered other facts suggesting causation, which she does not, Crockett would still fail to state a claim. She does not allege that the perpetrators of the harassment knew about her protected activity (i.e., her accommodation requests). *See Bouknight v. S.C. Dep't of Corr.*, 487 F. Supp. 3d 449, 478 (D.S.C. 2020) ("[T]o plausibly allege a retaliation claim, a plaintiff must assert facts showing that the employer was aware of the protected activity."); *Burrs v. Walter Kidde Portable Equip., Inc.*, No. 1:16-cv-01149, 2018 WL 1626120, at *3 (M.D.N.C. Mar. 30, 2018) ("If the actors had no knowledge of [plaintiff's] protected activity, their actions could not be in retaliation for that protected activity."). The only allegation that suggests any harasser knew of her accommodation requests is that Crockett was "harassed about trying to grieve the lack of disability accommodation" for her uniform and glasses. (*Id.* ¶ 189.) This lacks any factual detail about how she tried to grieve, how she was harassed, who harassed her, and when this occurred. Thus, it is insufficient to form the basis for Crockett's Section 504 retaliation claim.

Accordingly, the court will dismiss Crockett's Section 504 retaliation claim for failure to state a claim upon which relief can be granted.

### 3. Failure to Accommodate

Finally, Crockett asserts that Defendants failed to accommodate her disabilities. (SAC ¶¶ 203–04.) To make out a claim of failure to accommodate under the Rehabilitation Act, the plaintiff must allege that "(1) she was a qualified person with a disability; (2) the employer had notice of the disability; (3) the plaintiff could perform the essential functions of the position with a reasonable accommodation; and (4) the employer nonetheless refused to make the accommodation." *See Hannah P.*, 916 F.3d at 337 (4th Cir. 2019); *Plummer v. Wright*, No. CV

TDC-16-2957, 2017 WL 4417829, at *8–9 (D. Md. Oct. 3, 2017) (analyzing whether plaintiff "asserted facts supporting" these four elements in deciding whether to dismiss her Rehabilitation Act failure to accommodate claim).

Crockett alleges the following accommodation requests in her SAC: (1) cotton uniforms to accommodate her psoriasis, (2) glasses to accommodate her migraines, and (3) "no tight spaces" to accommodate her PTSD. (SAC ¶ 176.) Crockett does not allege when or to whom she made such requests, but she includes this information in the section of her complaint that discusses her experience at Fluvanna. (*See id.* at 21.) Defendants argue that the SAC does not make any specific allegations about the Defendants' response to the requests for uniforms, no tight spaces, and glasses—including "whether Defendants denied these requests" at all, or whether the denials were unreasonable. (Defs.' Br. at 6.)

The court agrees. Crockett does not allege that Defendants ever denied her ADA accommodation requests. None of the paragraphs Crockett cites to show that the accommodation requests were denied, (Pl.'s Br. at 17 (citing SAC ¶¶ 177, 180, 181, 189)), actually state that Defendants declined her requests. Rather, Crockett alleges that she "was accommodated" with the cotton uniforms and glasses "until Augusta leadership moved to Fluvanna, then she was harassed about her uniform" and "harassed about glasses." (SAC ¶¶ 180–181.) The fact that Crockett was harassed about her uniform and glasses by some unspecified individual or group and in some unspecified way does not, without more, give rise to the plausible inference that *Defendants* refused to make reasonable accommodations. Similarly, the vague allegation that Crockett was later "harassed about trying to grieve the lack of disability accommodation for her uniform" and glasses is not in itself enough to raise a right

to relief for employers' failure to reasonably accommodate above the speculative level. (*Id.* ¶ 189.) Crockett does not allege facts showing how or when Defendants refused to accommodate her conditions, such as by not allowing her to wear the cotton uniforms or glasses.

Accordingly, the failure to accommodate claim will be dismissed. And because Crockett does not allege facts sufficient to state a claim for discrimination, retaliation, or failure to accommodate under Section 504, Count I will be dismissed in full.

### B. Exhaustion of EEOC Remedies

Before delving into the substance of Crockett's Title VII claims, the court addresses Defendants' argument that the SAC's new allegations pertaining to the incidents in 2024 and 2025 are unrelated to the original EEOC charge. (Defs.' Br. at 15–16.) The SAC does not confirm that Crockett filed a new or amended EEOC charge about the new allegations, or that these acts are "reasonably related" to those alleged in her initial complaint. (*Id.* at 15.) Thus, Defendants contend that her Title VII claims must be dismissed for failure to exhaust administrative remedies. (*Id.* at 15–16.) Crockett only refutes Defendants' exhaustion argument as to her Title VII retaliation claim and does not address whether she has exhausted her discrimination claim. (*See* Pl.'s Br. at 25 n.5.) She states in a footnote that "Plaintiff had no duty to refile with the EEOC concerning retaliation that occurred after the first charge." (*Id.*)

"It is well settled that before filing suit under Title VII . . . a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC." *Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022). The charge "frames the scope" of a plaintiff's subsequent litigation; the

complaint's allegations "must correspond to those set forth in the [EEOC] charge." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506, 509 (4th Cir. 2005). Crockett, in her SAC, alleges discriminatory and retaliatory acts that occurred after she filed her January 2024 EEOC charge to support her Title VII claims.

"Only those discrimination claims stated in the initial [EEOC] charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). The Fourth Circuit has previously held that subsequent claims are "reasonably related" and thus exhausted where the allegations "involved the same place of work and the same actor," rather than "shifting sets and a rotating cast of characters that would have deprived her [] employer of notice of the allegations against it." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 595 (4th Cir. 2012); *see Chacko*, 429 F.3d at 506 ("We hold that a plaintiff fails to exhaust his administrative remedies where, as here, his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit.").

Notably, the "reasonably related" exhaustion requirement is more relaxed for a Title VII retaliation claim. *See Jacques v. Baltimore City Police Dep't*, No. CV 21-2682-BAH, 2023 WL 3198122, at *8 (D. Md. May 2, 2023); *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992); *Nam v. 2012 Inc.*, No. CV DKC 15-1931, 2016 WL 107198, at *5 (D. Md. Jan. 11, 2016). Retaliation claims "need not be filed in a new EEOC charge if they are reasonably related to allegations in an EEOC charge properly before the court and pertaining to conduct that occurred after the EEOC charge was filed." *Nam*, 2016 WL 107198, at *5 (citing *Jones v. Calvert Group, Ltd.*,

- 34 -

551 F.3d 297, 301–04 (4th Cir. 2009)).  "[A]n act committed by an employer in retaliation for the filing of an EEOC complaint is reasonably related to that complaint, obviating the need for a second EEOC complaint." *Jones*, 551 F.3d at 304 (emphasis omitted) (quoting *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir. 1988)).

Neither party has presented Crockett's EEOC charge or described its contents in detail. Thus, for both of Crockett's Title VII claims, the court is unable to determine whether her new allegations are reasonably related to her initial charge.  *See Farrington v. Westrock*, No. 1:18-cv-00240, 2018 WL 5831252, at *2 (M.D.N.C. Nov. 7, 2018) (dismissing plaintiff's Title VII claims because "[w]ithout the EEOC charge or, at least more detailed information about its contents within his pleading, he has not shown that the claims in the Complaint are reasonably related to his EEOC charge" (cleaned up)); *Jones v. Virginia Dep't of Soc. Servs.*, No. 1:18-cv-00380, 2019 WL 13295852, at *2 (E.D. Va. Mar. 14, 2019) (concluding that the court "cannot determine if his Title VII suit is within the scope of his EEOC charge" because plaintiff "did not attach a copy of his EEOC charge, nor any oath or affirmation as to what the charge contained"); *see also Bruton v. BMW Mfg. Co. LLC*, No. 7:24-cv-05762, 2025 WL 1189767, at *2–3 (D.S.C. Apr. 24, 2025) (analyzing the details set forth in the EEOC charge to determine whether plaintiff's Title VII retaliation claim was reasonably related); *Pitts v. Baltimore Police Dep't*, No. CV RDB-22-1404, 2023 WL 3158705, at *6 (D. Md. Apr. 28, 2023) (same). Crockett only states that her charge made "a report of gender discrimination, sexual harassment, and retaliation," and "disclosed that [she] has PTSD, complex PTSD, and panic disorder." (SAC ¶ 171.)  There is no clarification as to which conduct, actors, and time frames Crockett discussed in her charge.

Because the court cannot determine whether the new claims are reasonably related at this time, it will not consider new allegations of events occurring after the EEOC charge was filed—January 10, 2024—when evaluating Crockett's Title VII claims.

## C. Title VII Discrimination (Count II)

To state a claim for sex discrimination under Title VII, Crockett "must allege sufficient facts to make it plausible that (1) she suffered an adverse employment action, and (2) the action was because of her sex." *Franovich v. Hanson*, 687 F. Supp. 3d 670, 683 (D. Md. 2023) (citing *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584–85 (4th Cir. 2015)). "To allege that an employer acted because of [sex], there must be some connective thread between the alleged mistreatment and the protected status." *Kennedy v. NYX Ent., Inc.*, No. 8:25-cv-02035, 2025 WL 3017226, at *4 (D. Md. Oct. 28, 2025) (cleaned up). Crockett alleges that Defendants "harassed and discriminated against Plaintiff on the basis of her gender," and they "would not have taken [such] actions had Plaintiff been male and had the same reaction to the disturbing incident" in February 2023.[10] (SAC ¶¶ 211–12.)

Defendants once again move for dismissal of Crockett's Title VII sex discrimination claim on the grounds that she failed to adequately allege that Defendants "took adverse employment actions against Plaintiff *because* of her gender." (Defs.' Br. at 10.) The court

---

[10] In her response in opposition, Crockett briefly discusses sex discrimination under the theory of gender stereotyping. (Pl.'s Br. at 23–24.) The SAC does not allege a sex discrimination claim based on gender stereotyping. *See David v. Winchester Med. Ctr.*, No. 5:16-cv-00063, 2018 WL 310140, at *13 (W.D. Va. Jan. 5, 2018) ("The court will not read a gender stereotyping claim into Count I where none otherwise exists."); *see also Boyd v. Johnson Food Servs., LLC*, No. 3:17-cv-03414, 2019 WL 1090725, at *6 (D.S.C. Mar. 8, 2019) (explaining that the *Price Waterhouse* case first establishing the Title VII gender stereotyping claim "stands for the proposition that employers may not discriminate against women who fail to conform to conventional gender norms"). And even if the court were to consider this claim, the SAC still does not allege sufficient facts to support a reasonable inference that the purported decisionmaker, Newcomer, was motivated by the fact that Crockett is a woman. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); 42 U.S.C. § 2000e–2(m). As the court held in its previous memorandum opinion and reiterates in Section III.C, Crockett's assertion that Newcomer "apparently thought" her reaction to the February 2023 incident was based on her gender is too speculative and conclusory. (*See* Mem. Op. at 20 n.5 (Dkt. 44).)

agrees that the SAC lacks factual allegations making it plausible that she suffered an adverse employment action taken because she is a woman. First, Crockett does not plausibly allege that she was treated differently than a similarly situated employee because of her gender. *See Vincent*, 2020 WL 5710710, at *9. The SAC broadly compares Crockett to other officers and "individuals who received roving contracts," but does not specify the gender of these other individuals or other characteristics to show they are similarly situated. (SAC ¶¶ 141–43.)

When Crockett *does* compare herself to male colleagues, she relies on broad, conclusory allegations. For example, Crockett states that she "has been required to go above and beyond her male colleagues to prove herself as she has encountered DOC staff who believe that women work at the prison to bring in drugs or sleep with inmates." (*Id.* ¶ 12.) She also describes that, after her four years working at VDOC, she has realized that "if a man cries at the DOC, there was nothing perceived to be wrong with it," but "if a female cries, they are weak and should not be employed with the DOC." (*Id.* ¶ 24.) These conclusory assertions and beliefs are unsupported by facts; they are not enough to raise an inference of discrimination.

To be clear, the court does *not* require Crockett to provide comparator evidence. (*See* Pl.'s Br. at 20–21.) That said, in the absence of a meaningful comparator, Crockett must provide other factual allegations supporting a plausible inference of unlawful discrimination. *See Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x. 745, 748 (4th Cir. 2017) ("[A] plaintiff is not required to identify a similarly situated [] comparator to prove her discrimination claim, so long as she can establish an inference of unlawful discrimination through other means."). She does not provide such allegations in the SAC.

Here, Newcomer's statements and actions, including the new allegations, are insufficient to support a plausible inference of unlawful sex discrimination by VDOC and the Commonwealth. As the court stated in its last memorandum opinion:

> Crockett also alleges that Newcomer "apparently thought" Crockett's reaction to the February 2023 events was due to her gender. (Am. Compl. ¶ 57.) Because Crockett does not allege any facts to support this conclusory assertion, the court treats the allegation as speculative and insufficient to support her claim at this stage.

(Mem. Op. at 20 n.5 (Dkt. 44).) Crockett repeatedly relies on this "apparently thought" refrain throughout the SAC. (SAC ¶¶ 131, 141, 147, 212.) But she only provides speculative and vague allegations to support her assertion that Newcomer's actions following the February 2023 incident were driven by the fact that Crockett is a woman. Crockett cites unattributed rumors about how Newcomer was moved to a new prison due to issues with "how [he] treats women," (*id.* ¶ 140), Sergeant Tharp's statement that Newcomer hated Crockett because she wasn't Newcomer's "type" of woman, (*id.* ¶ 25), and the unattributed rumor that Newcomer only allowed "cute" women to work up front, (*id.* ¶ 21). These isolated statements and Crockett's speculative assertions are not enough for the court to plausibly infer that Newcomer's actions towards Crockett in the year following the February 2023 incident were motivated by bias against women. Lastly, the new allegation that Newcomer lied about Crockett having "received a substandard," (*id.* ¶ 148), is not specifically gender-related and is not probative of whether Newcomer's behavior raises a reasonable inference of sex discrimination.

The SAC also alleges several instances of Crockett being told to act in certain ways because she is a woman. Crockett was told to "keep things 'in the department,'" especially

- 38 -

because she is a woman, which the court explained was not enough to show sex discrimination. (Mem. Op. at 20.)  The SAC adds that: (1) Crockett was "treated differently as a female," (SAC ¶ 11); (2) she was "warned by Sergeant Ryan Hall that because she was a woman, she should 'get out'" and that he "would not let his wife work at the DOC," (*id.* ¶ 20); and (3) she was "told by her male supervision and colleagues not to show emotion or weakness," (*id.* ¶ 23). None of these statements tend to show "a general pattern of [sex] discrimination in the *employment practices* of the defendant." *Moore v. City of Charlotte, NC*, 754 F.2d 1100, 1105 (4th Cir. 1985) (emphasis added).  The first allegation is a broad and conclusory statement of Crockett's belief, lacking a specific factual basis.  The second conveys Hall's subjective belief, which omits a factual basis for his belief.  It is also not clearly an assertion about Defendants' discrimination in their employment practices; Hall does not attribute his opinion to the presence of mistreatment or sex discrimination by the employer-defendant.  The third allegation is an instruction that is not alleged to be specifically given to women.

Crockett does, however, allege several instances of harassment that have clear gender-based connotations: (1) Watkins called her a "big girl" or "big bitch," (SAC ¶ 46); and (2) Crockett was "told that it is perceived that she 'snitched' because she is female, and she has been nicknamed the 'snitch bitch' at DOC," (*id.* ¶ 165).[11]  These comments suffice to raise a general inference of sex discrimination, as they are gender-related.  *See Peterson v. MotorCo, LLC,*

---

[11] There are other allegations of potential gender-based harassment in the SAC—namely, the HR personnel referring to Crockett as a "bitch" on the phone and turning her away, (SAC ¶ 186); and the incident in which Crockett's male colleague helped plan sexual harassment involving the inmates, (*id.* ¶ 26).  However, for the reasons provided in Section III.B, at this time, the court does not consider allegations of events occurring after January 10, 2024.  Crockett did not provide a date or perpetrator name for the incident involving the inmates, and she did not include this allegation in her earlier complaint.  Thus, the court cannot ascertain whether it is reasonably related to the EEOC charge and properly before the court.

No. 1:23-cv-00546, 2025 WL 405775, at *10 n.15 (M.D.N.C. Feb. 5, 2025) ("[C]ourts have recognized that a woman being called a 'bitch' can 'constitute harassment based upon sex.'" (quoting *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009))).

But Crockett does not include allegations suggesting that either of these incidents is an adverse employment action that "affect[s] the terms and conditions of her employment." *Anthony*, 2022 WL 2541914, at *6. The first comment was made by Watkins, who is not alleged to be a decisionmaker or at all involved in the management decisions about Crockett's roving contracts, facility placement, and pay. The second comment was not attributed to anyone, and reflects a rumor conveyed to Crockett.

### ii. Hostile Work Environment

In a single sentence in her response brief, Crockett contends that "the harassment of Plaintiff, to include pejorative terminology, is an unlawful hostile work environment." (Pl.'s Br. at 24.) A plaintiff can state a claim for hostile work environment under Title VII by alleging that the harassment was: "(1) unwelcome, (2) because of [plaintiff's sex], (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer." *Stewart*, 800 F. Supp. 3d at 672 (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 313). "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). It is only "[w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

- 40 -

environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up). Such a high bar is not met here.

"When evaluating if employer conduct is severe or pervasive, the Fourth Circuit considers 'the status of the harasser' as well as 'the frequency of the discriminatory conduct; its severity; whether it's physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Stewart*, 800 F. Supp. 3d at 673 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015); *Laurent-Workman v. Wormuth*, 54 F.4th 201, 211 (4th Cir. 2022)). Harassment by supervisors is "particularly threatening" in hostile work environment cases. *Boyer-Liberto*, 786 F.3d at 278. Crockett does not allege that Watkins or other perpetrators of harassment were her supervisors.

The two aforementioned instances of alleged gender-based harassment—the Watkins statements and rumor about Crockett's nickname—occurred in February 2023 and at another unspecified time. But Crockett does not specify how often she was harassed on the basis of sex. As for the nature of the harassment, the Watkins incident involved physical threats. But Crockett does not allege any physical threats following that night. The other alleged gender-based harassment before the court—being told by someone that she is "nicknamed the 'snitch bitch' at DOC," is not clearly humiliating. (SAC ¶¶ 46, 165.) "Under the law, isolated instances of name calling are not sufficient to constitute a hostile work environment." *Callis v. Univ. of Maryland Med. Sys. Corp.*, No. CIV. L-08-3227, 2010 WL 1529401, at *3 (D. Md. Apr. 14, 2010); *see Chika v. Plan. Rsch. Corp.*, 179 F. Supp. 2d 575, 588 (D. Md. 2002) (finding that the "high standard" of hostile work environment was not met where plaintiff was called an

"asshole," "knucklehead," and "dick," and told "he had no life" on several different occasions).

Finally, Crockett generally alleges that the harassment interferes with her work performance. After the initial Watkins incident, she was diagnosed with PTSD. (SAC ¶ 121.) She was later diagnosed with complex PTSD and panic disorder "[d]ue to the events that [she] has endured." (*Id.* ¶ 166.) She explains that she often became sick due to the stress, which culminated in a complex PTSD breakdown in August 2023. (*Id.* ¶ 168.) She also "had to go on short-term disability for 2 months thereafter." (*Id.* ¶ 169.)

In all, accepting Crockett's allegations as true, the only factor that clearly weighs in favor of plausibly inferring a hostile work environment is interference with work performance. And even if Crockett had alleged a sufficiently severe and pervasive hostile environment, she would still need to allege adequate facts to suggest that her co-workers' statements may be imputed to her employer. "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Besides reporting the Watkins encounter, Crockett does not allege that Defendants "knew, or should have known, about the [gender-based] harassment and failed to take action reasonably calculated to stop it." *Bazemore v. Best Buy*, 957 F.3d 195, 201 (4th Cir. 2020). After Crockett complained to management about Watkins's February 2023 harassment, she was removed from Augusta Correctional Center and separated from Watkins. Her other allegations that she reported sex-based harassment either (1) occurred after January 2024 and are not properly before the court, or (2) are too vague to show that her employer knew or should have known about this sex-based harassment.

Ultimately, the SAC still does not allege sufficient facts to support Crockett's claim that she suffered Title VII discrimination on the basis of sex.  The court will dismiss Crockett's Title VII discrimination claim.

### D. Title VII Retaliation (Count III)

Title VII's antiretaliation provision, 42 U.S.C. § 2000e–3(a), prohibits "an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).  One such guarantee is protection from sex-based employment discrimination. 42 U.S.C. § 2000e–2(a).  Like a Section 504 retaliation claim, a plaintiff makes out a Title VII retaliation claim when she alleges that "(1) she engaged in a protected activity; (2) the employer acted adversely against [him]; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327–28 (4th Cir. 2018) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)); *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025).

There are two categories of protected activity: (1) opposition activity, or "oppos[ing] any practice made an unlawful employment practice" by Title VII; and (2) participation activity, or participating "in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e–3(a); *see EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005).  Opposition activity includes complaints to superiors in "response to an employment practice that is, or that the plaintiff reasonably believes is" a violation of Title VII.  *Pettis v. Nottoway Cnty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014).  Crockett alleges the same two protected activities that she alleged in her first amended complaint: her June

- 43 -

2023 report to Hernandez that she believed she was being retaliated and discriminated against, and her January 2024 EEOC charge. (*See* Pl.'s Br. at 24–25; SAC ¶¶ 141, 149, 171.)

   i.  *Crockett's Report to Hernandez*

In the SAC, Crockett introduces new details about her internal complaint to Hernandez. First, Crockett specifies that Hernandez is "Warden Newcomer's supervisor" and "Western Regional Administrator." (SAC ¶ 141.) Second, Crockett alleges that she reported to Hernandez "that she believed she was being retaliated against due to her legitimate reaction to Officer Watkins' threats of violence, which as stated, Warden Newcomer apparently thought was caused by [] Crockett being female." (*Id.*) Third, she clarifies that her conversation with Hernandez occurred in June 2023. (*Id.*)

In its prior memorandum opinion, the court emphasized that the complaint fails to put Defendants on notice that Crockett's report was complaining of a Title VII violation. (Mem. Op. at 23 (citing *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012).) Based on the wording of the SAC, it is still unclear what Crockett actually reported to Hernandez. Crockett alleges that she complained that Newcomer retaliated in response to *Crockett's reaction* to Watkins's threats. This alleged retaliation turns on Crockett's behavior and does not go to show discrimination or retaliation based on a protected class. In other words, it is unclear whether she conveyed to Hernandez that Newcomer "apparently thought" Crockett's reaction to the threats "was caused by" her being a woman. (SAC ¶ 141.) However, at the motion to dismiss stage, the court must "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

Thus, the court assumes that Crockett did communicate to Hernandez her belief that Newcomer thought Crockett's reaction was feminine or caused by her being a woman.

But even if Crockett did report this to Hernandez as sex discrimination or retaliation, she still does not explain how Hernandez's knowledge of this complaint led to any subsequent retaliation by the Defendants. Merely providing the job title that Hernandez had at VDOC and the fact that she supervised Newcomer does not show that she was a decisionmaker or at all involved in any of the subsequent alleged adverse actions that the court may consider—e.g., the denial of Crockett's request to stay at Sussex I and keep additional pay and placing Crockett for a week in Augusta without the option of roving or overtime compensation.[12] (Pl.'s Br. at 24 (citing SAC ¶¶ 150, 156)); *see Koonce v. Austin*, No. 3:21-cv-00660, 2022 WL 3006188, at *6 (E.D. Va. July 28, 2022) ("[T]he 'relevant decisionmaker' who committed the adverse action must have had actual knowledge of the plaintiff's protected activity."). Additionally, Hernandez's *inaction*, or the fact that she did not further investigate Crockett's complaint as his supervisor, is not sufficient to make out an adverse employment action. *See Cooper v. Smithfield Packing Co., Inc.*, 724 F. App'x 197, 202 (4th Cir. 2018) (concluding, in the Title VII retaliation context, that "failing to investigate [plaintiff's] complaints about [her supervisor]," "disregarding [her] concerns" about the supervisor's conduct, and even "'ratifying' [the supervisor's] conduct" did not constitute sufficiently adverse action).

---

[12] Again, although Crockett alleges that the continuing harassment by Augusta staff in 2024 was an adverse action taken in retaliation for her protected activity, these 2024 and 2025 allegations are not before the court for the reasons expounded in Section III.B.

- 45 -

*ii.  EEOC Charge as Protected Activity*

Crockett reasserts the EEOC charge filing as her second form of protected activity.  In her response brief, Crockett argues that the "adverse actions" she faced following her January 2024 EEOC Charge are the "ongoing retaliatory hostile work environment by Augusta staff who keep in contact with Newcomer."  (Pl.'s Br. at 25.)  But the court does not at this time consider allegations of events occurring after January 10, 2024, as it cannot yet determine whether they are reasonably related to the EEOC charge.  *See supra* Section III.B.  Without these post-charge factual allegations, Crockett does not plausibly state a claim that Defendants unlawfully retaliated against Crockett after she filed her EEOC charge.

Accordingly, Crockett's Title VII retaliation claim will be dismissed.[13]

### IV.   Conclusion

For the reasons outlined above, the court will **GRANT** Defendants' second motion to dismiss the amended complaint.  (Dkt. 49.)  The court will **DISMISS** Counts I, II, and III of the second amended complaint **without prejudice**.  The court will also **GRANT** Crockett leave to amend.  If Crockett does not file an amended complaint within 21 days of the date of the court's accompanying Order, the court will dismiss this action with prejudice.

If Crockett files an amended complaint, the parties may move for leave of court to extend the discovery deadline.  Otherwise, the close of discovery date of April 21, 2026, remains in place.  The deadline to file dispositive motions is vacated, and the status conference will no longer be held approximately one week after the close of discovery, as stated in the

---

[13] Because all three counts are dismissed for failure to state a claim, the court does not reach the argument of whether VDOC has the capacity to be sued.  (*See* Def.'s Br. at 16–17.)

court's December 11, 2025 order.  (Dkt. 61.)  The court will provide a new briefing schedule

for dispositive motions and status conference date if appropriate.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 23rd  day of April, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE