EEOC Form 5 (06/22)

First Charge

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: EEOC | Agency(ies) Charge No(s): |
|---|---|---|
| Virginia Department of Human Rights (State or local Agency, if any) and EEOC | | |
| Name *(indicate Mr., Mrs., Mrs., Miss, Mx., Dr., Hon., Rev., etc.)*<br>Nancy Sult Crockett | Home Phone<br>[redacted] | Year of Birth<br>[redacted] |
| Street Address, City State and ZIP Code<br>[redacted] | | |
| Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)* | | |
| Name<br>Virginia Department of Corrections / Commonwealth of Virginia | No. Employees, Members<br>500+ | Phone No.<br>(804) 674-3000 |
| Street Address, City State and ZIP Code<br>6900 Atmore Dr, Richmond, VA 23225 | | |
| DISCRIMINATION BASED ON<br>Sex, Hostile Work Environment, Retaliation | DATE(S) DISCRIMINATION TOOK PLACE<br>Earliest<br>February 1, 2023 | Latest<br>present (continuing action) |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Nancy Crockett has been a Corrections Officer with the Virginia Department of Corrections since August 10, 2021.

At the times relevant hereto, Ms. Crockett was working on a roving contract. Meaning, instead of working at her home facility, she worked at a facility away from home that was short-staffed. Ms. Crockett would travel to a facility far away from her family and work for 7 days straight, then come home for 7 days, and the cycle would repeat. Ms. Crockett's home prison was River North Correctional Center in Independence, Virginia. At the times hereto, Ms. Crockett was roving at the Augusta Correctional Center in Augusta County, Virginia. The facilities are over 3 hours away from one another.

On Wednesday, February 1, 2023, while working at the Augusta Correctional Center, Ms. Crockett was informed that she was going to be trained by Officer Watkins in Master Control. Upon arrival, Officer Watkins appeared agitated, stating that he was very angry about his paycheck and asserting that "either the bank or HR fucked up and shit is about to get real if it isn't fixed today." Then, Human Resources Representative Eppard came after shift change to inform Officer Watkins that his check was correct. Captain Burgandine also informed Officer Watkins to report to Lieutenant Armstrong's office. Officer Watkins returned approximately 30-40 minutes later, more visibly upset than before. Officer Watkins indicated that he had been on short-term disability "due to the stress this place is causing," and then he punched the logbook and began to pace back and forth. Officer Watkins began to make threatening statements, such as, if this ended up stressing out his fiancé, he would "shoot or kill every mother fucker from this compound" and that he was "the realest motherfucker here." The statements persisted for hours. Officer Watkins discussed taking guns from Master Control and going on the ridge and "picking one off at a time." Officer Watkins indicated that he would "never cuff up" and "the next paperwork [he] fille[d] out [would] be [his] commissary sheet." Sargent Johnson came into Master Control and held a conversation with his girlfriend, Officer Thacker, while Officer Watkins continued to make similar statements. Officer Watkins and Sargent Johnson then fist bumped and made plans to attend a rage room. Sargent Johson then left Ms. Crockett alone with Officer Watkins, again. Later, Sargent Johnson called and sounded like he was crying. Officer Watkins told Ms. Crockett to get Officer Watkins out of Master Control and into the Watch Room; Ms. Crockett did as instructed. Officer Watkins returned a few minutes later, but then sprinted to Front Entry. Ms. Crockett finally got a break and informed relief what had transpired. Relief told Ms. Crockett that Officer Watkins was "just blowing off steam." When Officer Watkins returned 2-3 hours later, he did appear calmer at first. However, while Officer Watkins

was teaching Ms. Crockett STARS, Lieutenant Scott called and told Officer Watkins that Officer Watkins, unfortunately, had been drafted. This sparked Officer Watkins' rage, and the comments about killing everyone, including Ms. Crockett, once again.

Ms. Crockett was held in Master Control for 9 hours by Officer Watkins while he threatened to kill her and every other officer there, making statements such as, "I am going to kill every mother fucker here" and "I control who gets in and out of this prison, I decide who lives and dies in this prison." Officer Watkins was not exaggerating — Master Control is where all the controls for the doors are in the prison and it comes equipped with two AR 15s and 12-guage shotguns and 60 rounds of ammunition, which Officer Watkins had the keys to. In contrast, Ms. Crockett had zero items of protection. While these events were transpiring, in the limited times she was able to make contact with others, Ms. Crockett reported the horrific events she was enduring to her Sargent, Lieutenant, and Captain, who all laughed at Ms. Crockett and told her she was "going to earn her money that night" and that was "just Watkins."

On Thursday, February 2, 2023, Ms. Crockett was informed that she was being sent back to Master Control for another shift. Terrified, for obvious reasons, Ms. Crockett requested that she be permitted to work in her building rather than Master Control. The Captain on shift, who was well aware of what had happened in Master Control the night before, then barked at Ms. Crockett, "are you refusing post?" Ms. Crockett indicated in response that she could not go into Master Control with Officer Watkins, but that if someone else could work with her and train her, she would go. Ultimately, Ms. Crockett went to Master Control. However, due to Officer Watkins' behavior the night before, Ms. Crockett had received no actual training on how to run Master Control. Therefore, Ms. Crockett called Captain Burgandine and Lieutenant Scott, informing them that she was going to need help as she was not able to learn the post due the hostile work environment the night before. Captain Burgandine and Lieutenant Scott gave Ms. Crockett pushback, indicating that she should be able to run it, and sent only very minimal help.

On the morning of Saturday, February 4, 2023, Sargent Tharpe asked Ms. Crockett why there was a running joke about her not running to Master Control anymore when Ms. Crockett had agreed to be cross trained. Ms. Crockett began to cry and informed Sargent Tharpe what had happened in Master Control. Sargent Tharpe told Captain Arnold and Lieutenant Curtis. Then, on Sunday, February 5, 2023, Warden Newcomer told Ms. Crockett that she had one hour to write a statement. Writing a statement, one that is truthful, is a death knell in the Virginia Department of Corrections. Ms. Crockett was trained, repeatedly, to keep things "in the department." Ms. Crockett was informed repeatedly that this was especially required if you are female. Thus, Ms. Crockett asked to call her Warden at her home prison. Ms. Crockett spoke to Warden David Anderson in front of an Augusta Correctional Center Lieutenant and Captain. Ms. Crockett reported to Waren Anderson during this call that she was held hostage by a disgruntled employee and after she reported it nothing was done, and now they were trying to force her to give a written statement. Warden Anderson responded, "I want you to get the fuck out of there," or words to that effect. Warden Anderson then stated to the Augusta Correctional Center management present for the call, "I don't know what you have going on at that prison, she is one of our top officers," or words to that effect. The Lieutenant and Captain responded that Ms. Crockett also had no issues during her time at Augusta Correctional Center. Ms. Crockett requested that a car be shipped out for her, or she would call for her husband to come get her. Ultimately, Ms. Crockett's husband came and picked her up.

Warden Anderson informed Ms. Crockett to come meet with him the following morning. Thus, on the morning of Monday, February 6, 2023, Ms. Crockett went to Warden Anderson's office, who also had the Assistant Warden present. Warden Anderson then asked Ms. Crockett to tell him what happened and wanted to know, "what will it take to make you happy?", "what do you want out of this?", "what will it take to keep this quiet?".

Ms. Crockett responded that she just wanted her same hours, same pay, etc. Warden Anderson responded, "you are making more money than the wardens," to which Ms. Crockett indicated that it was tough, though, being away from her family for 7 days at a time, with frequency, and she had been doing it for the money.

Warden Anderson indicated that, while the incident was under investigation, Ms. Crockett could work at River North. Ms. Crockett provided her statement on February 6, 2023. The investigation ultimately concluded on March 14, 2023.

Once the investigation concluded, Warden Anderson indicated to Ms. Crockett that he had bad news — the only "solution" Warden Newcomer would allow is that, (1) Ms. Crockett was never allowed to work at Augusta Correctional Center while Newcomer is Warden, and (2) the only facility in the entire state of Virginia Newcomer would agree that Ms. Crockett could rove at (in order to keep her higher pay) was Sussex 1, the worst correctional center in Virginia, which was also 5 hours away from Ms. Crockett's home and family. Warden Anderson indicated that he thought it was safest for Ms. Crockett to take the pay cut of almost $50,000 per year and stay at River North. Ms. Crockett was informed with regard to Sussex I, "it's a gang prison, being run by gang members".

Ms. Crockett spoke with her husband and decided she was going to try Sussex I to keep the pay. Thus, Ms. Crockett received a new, 6-month roving contract and worked at Sussex I.

Then, in approximately May 2023, in the middle of Ms. Crockett's roving contract, Ms. Crockett received a notice of a change to the roving program, indicating that correctional officers could not rove outside their region anymore. The only available correctional center offering roving within Ms. Crockett's region was Augusta Correctional Center, which Warden Newcomer had banned Ms. Crockett from working at due to her reaction to being held hostage — a reaction that was entirely normal for any human being, but which Warden Newcomer apparently thought was caused by Ms. Crockett being female. Ms. Crockett called Regional Manager Roger Walz and met the Warden at Sussex I to discuss staying at Sussex I on the roving contract. Ms. Crockett was informed by HR that it should not be a problem for Ms. Crockett to remain at Sussex I as, given what happened at Augusta Correctional Center to Ms. Crockett, an exception to the new policy should be made for her. Ms. Crockett was also informed that the Department of Corrections was so understaffed at the facilities on the roving list that the Department of Corrections would not stop Ms. Crockett from being able to rove.

Despite all these representations, when Ms. Crockett requested to continue in the roving program, Ms. Crockett was informed in June 2023 that she was not being given a roving contract and therefore was being terminated from the roving program at the end of her current contract, which resulted in an approximate $50,000 per year loss of income to Ms. Crockett. Ms. Crockett reported to Lisa Hernandez, Western Regional Administrator, that she believed she was being retaliated against—she graduated with honors from the academy, she was approaching her second year with the Department of Corrections, she was never late, she had perfect attendance, she had successfully worked in 3 institutions without a verbal counseling, sub-standard, or group notice, and the individuals who did receive roving contracts had disciplinary issues, unlike Ms. Crockett. For example, Officer Holt had paperwork for bringing items inside the prison and was written up for not completing training. Ms. Crockett understands that it was Warden Newcomer's, along with Regional Manager Roger Walz's and the Augusta team's, decision to deny her a roving contract. Ms. Crockett was informed directly, "You were not recommended for a roving contract at Augusta because of the incident that occurred in February 2023," while she was simultaneously informed that Warden Anderson speaks highly of her and believes she has a "bright future with the VADOC."

Thus, Ms. Crockett was moved to Cold Springs Correctional Unit in Greenville, Virginia in the beginning of July 2023. Two weeks into Ms. Crockett's placement at Cold Springs Correctional Unit, she was drafted to go to Augusta Correctional Center for a week. Despite Warden Newcomer not permitting Ms. Crockett to make extra money and rove at Augusta Correctional Center, apparently, he was perfectly fine with Ms. Crockett being reduced to normal pay but then being drafted to work at Augusta Correctional Center. Moreover, Warden Newcome was required to approve overtime, and indicated that Ms. Crockett would not be approved for overtime while at Augusta Correctional Center. Thus, Ms. Crockett was welcome to work at Augusta Correctional Center for the lowest pay, but she was not allowed to work there roving or on overtime, receiving more pay. During Ms. Crockett's week at Augusta Correctional Center,

Augusta Correctional Center, Ms. Crockett learned a lot more about what had happened — Ms. Crockett was informed that none of the supervisors to whom she had reported the events on February 1, 2023 were disciplined for failing to report the matter, save for a short transfer to day shift; instead, it was stated that sending Ms. Crockett away was supposed to have "taken care of the issue." Ms. Crockett was informed that this was decided at a supervisors meeting, and Warden Newcomer was the decisionmaker. Ms. Crockett also learned that Officer Watkins had gone home from the February 1, 2023 shift and abused his girlfriend so badly that she went to the psych ward. Moreover, Ms. Crockett learned that Officer Watkins had this violent behavior before she was required to work with him and the prison knew of his violent behavior, reports had been made, yet Warden Newcomer did nothing to stop his harassment.

Due to the events Ms. Crockett has endured, she has been diagnosed with PTSD, complex PTSD, and panic disorder. After these events, Ms. Crockett frequently became sick due to the stress, stopped sleeping, golfing, fishing, going to church, until it reached the point that Ms. Crockett suffered a complex PTSD breakdown in August 2023. Ms. Crockett had to go on short-term disability for 2 months thereafter. Ms. Crockett returned to work in October 2023. To this day, Ms. Crockett is triggered by certain events, such as learning a mass shooting has occurred.

Warden Newcomer has recently been moved to a new prison, upon information and belief, due to an issue that was finally addressed with regard to how he treats women.

In conclusion, the Virginia Department of Corrections / Commonwealth of Virginia has participated in, and permitted, a culture of discrimination and a hostile work environment to exist against Ms. Crockett on the basis of Ms. Crockett's gender, female, and has retaliated against Ms. Crockett for making complaints concerning the discrimination and harassment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et. seq.*

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* [signature] |
| I declare under penalty of perjury that the above is true and correct. 1-9-24 *Date* [signature: Nancy Crockett] *Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT [signature: Nancy Crockett] |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) ~~6/30/~~ 1/9/2024 |

DANICA JADE CRIGGER
Notary Public
Commonwealth of Virginia
Reg. No. 7669240
My Commission Expires 6/30/24

Second Charge

EEOC Form 5 (06/22)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| EEOC | |

Virginia Department of Human Rights and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Mrs., Mrs., Miss, Mx., Dr., Hon., Rev., etc.)* | Home Phone | Year of Birth |
|---|---|---|
| Nancy Sult Crockett | [redacted] | [redacted] |

Street Address, City State and ZIP Code

[redacted]

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| Virginia Department of Corrections / Commonwealth of Virginia | 500+ | (804) 674-3000 |

Street Address, City State and ZIP Code

6900 Atmore Dr, Richmond, VA 23225

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE Earliest | Latest |
|---|---|---|
| Sex, Hostile Work Environment, Retaliation | January 10, 2024 (for this charge) | November 21, 2025 (continuing action) |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Nancy Crockett was a Corrections Officer with the Virginia Department of Corrections from August 10, 2021 to November 21, 2025. Ms. Crockett filed a Charge of Discrimination with the EEOC on January 10, 2024, concerning sex discrimination, hostile work environment, and retaliation, EEOC Charge. No. 438-2024-00669.

After Ms. Crockett filed her charge of discrimination, the discrimination and hostile work environment she was enduring continued through the rest of her employment, and she encountered retaliation due to the filing of her EEOC Charge of Discrimination. What Ms. Crockett experienced is set forth in the attached Third Amended Complaint, which is incorporated as if set forth fully here.

The Virginia Department of Corrections / Commonwealth of Virginia has participated in, and permitted, a culture of discrimination and a hostile work environment to exist against Ms. Crockett on the basis of Ms. Crockett's sex, female, and has retaliated against Ms. Crockett for making complaints concerning the discrimination and harassment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et. seq.*

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

05 / 18 / 2026

*Date*

Nancy Crockett

*Charging Party Signature*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*)

Doc ID: 23e05919e55f74bdfad17d76863a75db5725b411

Dropbox Sign Audit trail

| | |
|---|---|
| **Title** | Crockett EEOC Charge_Second_TO SIGN.pdf |
| **File name** | Crockett%20EEOC%2...ond_TO%20SIGN.pdf |
| **Document ID** | 23e05919e55f74bdfad17d76863a75db5725b411 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | Signed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| SENT | **05 / 18 / 2026** 19:33:06 UTC | Sent for signature to Nancy Crockett (gailcrockett@yahoo.com) by services@clio.com acting on behalf of brittany@haddox.law IP: 71.62.172.169 |
| VIEWED | **05 / 18 / 2026** 22:10:48 UTC | Viewed by Nancy Crockett (gailcrockett@yahoo.com) IP: 184.52.106.234 |
| SIGNED | **05 / 18 / 2026** 22:11:20 UTC | Signed by Nancy Crockett (gailcrockett@yahoo.com) IP: 184.52.106.234 |
| COMPLETED | **05 / 18 / 2026** 22:11:20 UTC | The document has been completed. |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

| | |
|---|---|
| **NANCY CROCKETT,**<br>**Plaintiff,**<br>**v.**<br>**COMMONWEALTH OF VIRGINIA, VIRGINIA DEPARTMENT OF CORRECTIONS,**<br>**Defendants.** | **Civil Action No. 5:24-cv-84** |

**THIRD AMENDED COMPLAINT**

COMES NOW Nancy Crockett, by counsel, and moves for judgment against Defendants Commonwealth of Virginia and Virginia Department of Corrections (collectively, "DOC"), jointly and severally, and as grounds therefore states as follows:

## I. JURISDICTION AND VENUE

1. At the times material hereto, Nancy Crockett is and was a resident of Bastian, Virginia.

2. At the times material hereto, the Commonwealth of Virginia is a state, and the Virginia Department of Corrections is the governmental agency responsible for operating prisons and correctional facilities in the Commonwealth of Virginia.

3. At the times material hereto, Ms. Crockett was Defendants' employee.

4. A substantial part of the acts and/or omissions of Defendants from which the causes of action arise occurred within Craigsville, Virginia, which is within Augusta County.

5. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about January 10, 2024, alleging sex discrimination, hostile work environment based on sex, and retaliation pursuant to Title VII of the Civil Rights Act, setting

forth a summary of the events described herein through that time. Plaintiff listed that the discrimination and retaliation was still occurring at “present” and was a “continuing action.” Plaintiff received a Notice of Right to Sue from the EEOC on July 26, 2024, Exhibit A, and filed her Amended Complaint setting forth her Title VII claims within 90 days of receiving the Notice of Right to Sue. Plaintiff was not required to file again with the EEOC concerning retaliation that occurred thereafter due to the filing of the Charge of Discrimination. *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992) (“a separate administrative charge is not pre-requisite to a suit complaining about retaliation for filing the first charge” (citations omitted)). Similarly, acts that are part of the hostile work environment occurring after the filing of a charge are also actionable without filing another Charge of Discrimination under the well-established doctrine of continuing violations.

## II. FACTS

6. Nancy Crockett was a Corrections Officer with the DOC from August 10, 2021 until November 26, 2025.

7. Ms. Crockett was a Lead Corrections Officer from February 2025 until November 26, 2025.

8. Ms. Crockett was an honor graduate of her academy class at the DOC.

9. Throughout her employment with the DOC, Ms. Crockett received commendations for going above and beyond.

10. Ms. Crockett was never written up during her employment with the DOC, including but not limited to ever receiving a substandard.

11. Throughout her employment with the DOC, Ms. Crockett was treated differently as a female. Ms. Crockett also observed other female employees being treated differently due to their

gender. The harassment of Ms. Crockett on the basis of her gender started from the very beginning of Ms. Crockett's employment and never ceased.

12. For example, at the beginning of Ms. Crockett's employment at River North Correctional Center, Ms. Crockett was helping with providing inmates with cereal, and the inmates were not being provided with milk. Ms. Crockett's male colleague told her that he was going to run over to the chow hall to get some milk. Little did Ms. Crockett know, the male officer was setting up a horrific sexual assault in conjunction with the inmates. As soon as Ms. Crockett's male colleague left, an inmate yelled, "machine gun," every tray slot opened, and each male began masturbating to make the "milk." The male colleague who had left Ms. Crockett allegedly to go to the chow hall to get milk was instead up in the control room laughing like crazy.

13. Ms. Crockett was further informed by Sergeant Madda at River North Correctional Center near the beginning of her employment that she was "under a magnifying glass because you're a female in the back of a man's prison," or words to that effect.

14. Throughout her employment with the DOC, Ms. Crockett was required to go above and beyond her male colleagues to prove herself as DOC employees told her that they believed that women work at the prison to bring in drugs or sleep with inmates. Ms. Crockett was told this by at least the following individuals at River North Correctional Center near the beginning of her employment: Lieutenant Brown (male), Training Lieutenant Crab (male), and Sergeant Madda (female).

15. Throughout her employment with the DOC, Ms. Crockett was frequently told by her male supervision and colleagues not to show emotion or weakness. For example, while at River North Correctional, Ms. Crockett's first placement at the DOC, Ms. Crockett was assaulted by an inmate. Lieutenant Murray and Lieutenant Wolfe told Ms. Crockett to "suck it up" and "don't show

emotion." Despite statements being made like this to Ms. Crockett frequently, Ms. Crockett never heard similar statements being made to male officers.

16. Based on what she personally witnessed and what she was told throughout her four plus years of employment, if a man cries at the DOC, there was nothing perceived to be wrong with it. However, if a female cries, they are weak and should not be employed with the DOC. By way of example, Ms. Crockett witnessed Sergeant Johnson crying multiple times at Augusta Correctional Center during the time Ms. Crockett was roving at Augusta Correctional Center, and Ms. Crockett never heard anyone make any negative statements related to the same. When Ms. Crockett cried while roving at Augusta Correctional Center, she was reminded by her male supervision that she could not show weakness.

17. On or about September 25, 2022, Ms. Crockett began working on a roving contract.

18. Roving contracts are typically for a period of 6 months.

19. On the roving contract, instead of working at her home facility, Ms. Crockett worked at a short-staffed facility. Ms. Crockett traveled to this facility, far away from her family, worked for 7 days straight, then came home for 7 days, and the cycle would repeat.

20. Ms. Crockett received double pay for roving.

21. During the time that Ms. Crockett was roving, Ms. Crockett's home prison was River North Correctional Center in Independence, Virginia.

22. From approximately September 25, 2022 until February 6, 2023, Ms. Crockett was roving at the Augusta Correctional Center in Augusta County, Virginia.

23. River North Correctional Center and Augusta Correctional Center are over 3 hours away from one another.

24. When Ms. Crockett arrived to initially work at Augusta Correctional Center, she was warned by Sergeant Ryan Hall that because she was a woman, she should "get out." Sergeant Hall further indicated that he would not let his wife work at the DOC, especially at Augusta.

25. Ms. Crockett was also informed by Sergeant Johnson, Sergeant Actin, and Front Entry Officer Hannah Shortridge at Augusta Correctional Center that Augusta's Warden, Warden Newcomer, permitted only the "cute" women to work up front. Ms. Crockett was informed that she would be working at the back of the prison.

26. The harassment of female employees at the Augusta Correctional Center by Warden Newcomer was worse for females who did not fit the gender stereotype of being petite attractive women. Ms. Crockett did not fit Warden Newcomer's stereotype of a petite attractive woman.

27. During Ms. Crockett's time roving at Augusta Correctional Center, there were three female officers on night shift, Ms. Crockett, Officer Sheppard, and Officer Ratliff. Officer Sheppard was placed in medical (a preferred area) because she fit the stereotypical female gender of a petite attractive woman. Officer Sheppard was permitted to work in the same area as her fiancé, Officer Crater, due to having a relationship with another officer. Ms. Crockett was required to work in the back of the prison (the worst area) because she did not fit the stereotype of a petite attractive woman and was not sleeping with another employee.

28. During Ms. Crockett's time roving at Augusta Correctional Center, Sergeant Tharp informed Ms. Crockett that Warden Newcomer hated Ms. Crockett because she was not Warden Newcomer's "type." Sergeant Tharp stated that Warden Newcomer's type was "little blondes." Ms. Crockett is not a "little blonde."

29. During Ms. Crockett's time roving at Augusta Correctional Center, Officer Hannah Shortridge told Ms. Crockett that Officer Shortridge got to work up front at the Augusta

Correctional Center because you "have to know who to fuck at the DOC." Officer Shortridge later became pregnant by Sergeant Ramsey while roving at Augusta Correctional Center.

30. Then, on Wednesday, February 1, 2023, while working at the Augusta Correctional Center, Ms. Crockett was informed that she was going to be trained by Officer Watkins in Master Control.

31. Being trained by Officer Watkins placed Officer Watkins in a position of power over Ms. Crockett that evening.

32. Master Control is where all the controls for the doors are in the prison.

33. Unknown to Ms. Crockett at the time, but known to Ms. Crockett's supervision, Officer Watkins had reportedly lost his FTO (field training officer) status due to participating in an event in which Officer Sprouse had cleaning chemicals put in his drink, ultimately resulting in Officer Sprouse being on anxiety and acid reflux medication.

34. Unknown to Ms. Crockett at the time, but known to Ms. Crockett's supervision, Officer Watkins was known at Augusta for being a hot head.

35. Unknown to Ms. Crockett at the time, but known to Ms. Crockett's supervision, there were several occasions where Officer Watkins was not properly addressed, disciplined, and/or corrected in accordance with protocol, further emboldening his behavior.

36. In short, nobody controlled Officer Watkins. He did what he wanted to.

37. Ms. Crockett had witnessed Officer Watkins blurt out in briefing before, "shots fired, shots fired," but otherwise did not have personal experience with him.

38. It was very odd that Ms. Crockett was assigned to work in Master Control that evening as rovers are not typically assigned to Master Control.

39. Further, Ms. Crockett did not request to be trained in Master Control.

40. Ms. Crockett also had not disclosed that she had worked in Master Control at a different facility, which information was irrelevant in any event as Augusta is a very old facility and did not use technology similar to Ms. Crockett's prior experience in Master Control.

41. Officer Watkins also was not typically assigned to Master Control; it was typically Officers Sprouse and Sanders.

42. Ultimately, it appeared Ms. Crockett was selected to work with Officer Watkins because she is female and would not fight back against Officer Watkins, who was known by management to be out of control that evening.

43. Ms. Crockett was one of three women as compared to the approximate 30 men on shift.

44. Officer Watkins was just arriving back at the DOC from stress leave.

45. Captain Burgandine knew at the time that he assigned Ms. Crockett to work with Officer Wakins that night that Officer Watkins was upset.

46. The night that unfolded for Ms. Crockett is nothing short of a real-life horror story.

47. Upon arrival in Master Control, Officer Watkins appeared agitated, stating that he was very angry about his paycheck and asserting that "either the bank or HR fucked up and shit is about to get real if it isn't fixed today," or words to that effect.

48. Captain Burgandine stopped by and told Officer Watkins that Human Resources Representative Mary Eppard was coming by to explain something to him and he "better act like [he had] got some sense."

49. Lieutenant Scott also came by Master Control soon thereafter, already aware that Officer Watkins was upset.

50. After Captain Burgandine stopped by, Officer Watkins looked at Ms. Crockett and said something like, “You are going to earn your money tonight” then followed it with either “big girl” or “big bitch,” or words to that effect.

51. When Ms. Crockett asked Officer Watkins what he meant, he indicated, “Well, I didn’t get a paycheck. I’m killing every one of you motherfuckers that are here tonight,” or words to that effect.

52. Then, Human Resources Representative Eppard came and told Officer Watkins that if he would ever think about checking his emails, he would have known that his short-term was denied, and not only was his check that day correct (he received a paycheck for approximately $300), he was not getting a check on the 16th, and he owed approximately $960 for insurance, or words to that effect.

53. Captain Burgandine informed Officer Watkins to report to Lieutenant Armstrong’s office.

54. Officer Watkins returned approximately 30-40 minutes later, more visibly upset than before. Officer Watkins indicated that he had been on short-term disability “due to the stress this place is causing,” or words to that effect, and then he punched the logbook and began to pace back and forth.

55. Officer Watkins continued to make threatening statements, such as, “If they upset my fiancée, you know, it’s over. When she finds out I can’t make a car payment, I can’t even make a car payment, it’s over,” or words to that effect.

56. Officer Watkins also stated, “I’m killing everybody at this motherfucker,” or words to that effect.

57. Officer Watkins also stated, “I’m killing the roving officers,” or words to that effect.

58. Officer Watkins also stated, “They want me to train you, I’m killing them too,” or words to that effect.

59. Officer Watkins also stated that he was “the realest motherfucker here,” or words to that effect.

60. Officer Watkins discussed taking guns from Master Control and going on the ridge and “picking one off at a time,” or words to that effect.

61. Officer Watkins walked to the guns, two AR 15s and 12-guage shotguns and 60 rounds of ammunition, and stated, “The coolest thing is, I’m using the state’s ammo, I’m going right up there on that ridge, I’m going to pick y’all off one at a time. The next paperwork I do is going to be my commissary sheet because I’m not cuffing up. If you think a prison was meant to keep people in, and I’m in control, I’ll pick y’all off like rats. I’m killing every motherfucker here tonight,” or words to that effect.

62. Statements by Officer Watkins of the nature set forth above persisted for hours.

63. While this was transpiring, Sergeant Johnson came into Master Control. Officer Watkins stated to Sergeant Johnson, “I’m killing all these motherfuckers tonight. Right, dude?,” or words to that effect.

64. Officer Watkins and Sergeant Johnson fist bumped and made plans to attend a rage room (a room where individuals can smash and destroy objects to vent rage) in Charlottesville on Saturday night.

65. Sergeant Johnson did not address, correct, or prevent the severe harassment and threats of violence.

66. Sergeant Johnson then left Ms. Crockett alone with Officer Watkins, again.

67. In addition to Sergeant Johnson witnessing it firsthand, as soon as she was able to that evening, Ms. Crockett reported the harassment to Sergeant Johnson, Lieutenant Scott, and Captain Burgandine using the phone in Master Control, and Ms. Crockett told them as they were passing by Master Control.

68. Each told Ms. Crockett, "That's just Watkins," or words to that effect.

69. Later, Sergeant Johnson called Officer Watkins and from what Ms. Crockett could hear of the conversation, it sounded like Sergeant Johnson was crying. Officer Watkins then ran out of Master Control and into the Watch Room. Officer Watkins returned a few minutes later but then sprinted to Front Entry. Officer Watkins' behavior was bizarre.

70. Ms. Crockett finally got a break and informed relief personnel, Officers Gideos, and Wills, that Officer Watkins was threatening to kill everybody. Ms. Crockett indicated that Officer Watkins had lost it, that he was threatening to kill her, and he was threatening to kill others. Reports continued to fall on deaf ears. Officers Gideos and Wills also responded, "That's just Watkins," and that Officer Watkins was "just blowing off steam," or words to that effect.

71. Officer Watkins returned 2-3 hours later.

72. Ms. Crockett was later informed by Sergeant Tharp that Officer Watkins had left and went home during the 2-3 hours he was gone from Master Control and beat his significant other and told her, "I'll not only kill you, that would be too easy. I'll kill your kids and you'll know what it's like to live the rest of your life like that," or words to that effect.

73. When Officer Watkins returned from the extended break, he appeared calmer at first. However, almost immediately upon his return, Lieutenant Scott called and told Officer Watkins, "Hey, brother, I know you're having a rough night, but I'm about to make it rougher. You just got drafted," or words to that effect. Drafted meant that Officer Watkins had to work overtime hours.

74. This sparked Officer Watkins' rage and the threats about killing everyone, including Ms. Crockett, once again.

75. Officer Watkins told Ms. Crockett that he had enough weapons to kill them all in his car, home, and Master Control.

76. Ms. Crockett was scared to death.

77. It's a man's world in the DOC, and Ms. Crockett was afraid to show fear. Ms. Crockett was afraid to cry.

78. Warden Newcomer viewed crying as a security risk.

79. Ms. Crockett was confined in Master Control for 9 hours with Officer Watkins while he threatened to kill her and every other officer there, making statements such as, "I am going to kill every mother fucker here" and "I control who gets in and out of this prison, I decide who lives and dies in this prison," or words to that effect, Ms. Crockett felt that she was a hostage.

80. Master Control comes equipped with two AR 15s and 12-guage shotguns and 60 rounds of ammunition, to which Officer Watkins had the keys.

81. In contrast, Ms. Crockett had zero items of protection.

82. As stated, while these events were transpiring, Ms. Crockett reported the horrific events she was enduring to Sergeants, Lieutenants, and Captains, who all laughed at Ms. Crockett and told her she was "going to earn her money that night" and that was "just Watkins."

83. On Thursday, February 2, 2023, Ms. Crockett was informed by Captain Burgandine that she was being sent back to Master Control for another shift.

84. Terrified, Ms. Crockett requested Captain Burgandine that she be permitted to work in her building rather than Master Control.

85. Captain Burgandine, who was well aware of what had happened in Master Control the night before, then barked at Ms. Crockett, “are you refusing post?,” or words to that effect.

86. Ms. Crockett indicated in response to Captain Burgandine that she could not go into Master Control with Officer Watkins, but that if someone else could work with her and train her, she would go.

87. Ultimately, Ms. Crockett went to Master Control.

88. Due to Officer Watkins’ behavior the night before, Ms. Crockett had received no actual training on how to run Master Control. Therefore, Ms. Crockett called Captain Burgandine and Lieutenant Scott, informing them that she was going to need help as she was not able to learn the post due to the hostile work environment the night before. Captain Burgandine and Lieutenant Scott gave Ms. Crockett pushback, indicating that she should be able to run it, and sent only very minimal help.

89. On Thursday, February 2, 2023, Ms. Crockett also reported to Sergeant Floyd the threats of violence she had endured the night before and the fact that she had previously reported the threats to other supervisory personnel.

90. Sergeant Floyd asked Ms. Crockett whether the management she reported it to (Johnson, Scott, and Burgandine) had told Ms. Crockett to write a report. When Ms. Crockett confirmed that they had not asked her to write a written statement, Sergeant Floyd directed Ms. Crockett not to say anything further until she was at River North, at which point she should report it again.

91. Sergeant Frazier (female) also told Ms. Crockett, “Listen, I’m the only female sergeant here. You got to be so careful. You’re a female. Be careful. Be careful, you’re a female. Be careful what you say. [Investigator] Lokey’s -- Lokey and Johnson and Actin and Watkins are all tight,” or words to that effect.

92. On Thursday, February 2, 2023, Ms. Crockett was finally told that management was going to report the harassment further up the chain of command as required by policy and the law.

93. During the Friday, February 3, 2023 to Saturday February 4, 2023 shift, Sergeant Tharp asked Ms. Crockett why there was a running joke about her not working in Master Control anymore when Ms. Crockett had agreed to be cross trained.

94. In response, Ms. Crockett began to cry and informed Sergeant Tharp what had happened in Master Control.

95. Sergeant Tharp then reported the matter to Captain Arnold and Lieutenant Curtis.

96. In response, Arnold and Curtis asked Ms. Crockett where the reports were from the leadership that she had reported it to during shift. Ms. Crockett indicated that she did not know where any physical reports were, but that she had done what she had been trained to do, report it to her chain of command and let them report it further up the chain of command, instead of jumping chain.

97. On the Saturday, February 4, 2023 to Sunday February 5, 2023 shift, no one said a word about the matter to Ms. Crockett.

98. On Wednesday, February 1, 2023, Ms. Crockett was not asked to report it in writing.

99. On Thursday, February 2, 2023, Ms. Crockett was not asked to report it in writing.

100. In fact, on Thursday, February 2, 2023, Ms. Crockett was warned by multiple Sergeants not to do anything further until she was at her home facility due to the lack of reporting further up the chain by Augusta leadership.

101. On Friday, February 3, 2023, Ms. Crockett was not asked to report it in writing.

102. On Saturday, February 4, 2023, Ms. Crockett was not asked to report it in writing.

Case 5:24-cv-00084-JHY-JCH Document 73 Filed 05/14/26 Page 14 of 51
Pageid#: 624

103. On the night of Sunday, February 5, 2023, Ms. Crockett was told for the first time that she had to write a statement and was told by Augusta Correctional Center Warden Newcomer that she had 1 hour to write it and was not permitted to leave the Watch Office in the meantime.

104. Writing a truthful statement identifying negative behavior is a death knell in the DOC. Ms. Crockett was informed, repeatedly, by her male supervisors that this was especially required if you are female. Ms. Crockett was trained, repeatedly, to keep things "in the department." By way of example, when Ms. Crockett went to HR to report harassment and retaliation and to attempt to file a grievance related to the same, Dana Harty in HR and Western Regional Administrator Lisa Hernandez told Ms. Crockett that she should not "start paper trails" and instead she needed to go through her immediate management.

105. As Warden Newcomer was being very aggressive with Ms. Crockett, Ms. Crockett asked a very legitimate question, "Why are you not talking to your supervisors that I reported this to? Why are you talking to me like this?," or words to that effect.

106. Due to the severe distress she was suffering from the event, Ms. Crockett accurately related to Warden Newcomer that she had not slept in four days, was tired, and wanted to talk to her Warden. She wanted to talk to her home facility Warden because, by this point, given how everything had unfolded, the statements made by Sergeant Floyd, the harassment she had endured, the failure of the supervisors and officers to correct or stop the harassment, and the failure of supervisors to report it up the chain of command as required by DOC policy (especially considering that officers are not supposed to skip rank in the chain of command), she believed that Augusta management was dirty.

107. Ms. Crockett then hung up with Warden Newcomer and called Warden David Anderson, who was Warden at Ms. Crockett's home prison, River North.

108. Ms. Crockett spoke to Warden Anderson in front of Lieutenant Curtis and Captain Armstrong from Augusta Correctional Center.

109. Ms. Crockett reported to Warden Anderson during this call that she was held hostage by a disgruntled employee and after she reported it, nothing was done, and now they were trying to force her to give a written statement.

110. Warden Anderson instructed the management present with Ms. Crockett, Lieutenant Curtis and Captain Armstrong, to keep her safe.

111. Warden Anderson further stated, “I want you to get the fuck out of there,” or words to that effect.

112. Warden Anderson then stated to the Augusta Correctional Center management present for the call, “I don’t know what you have going on at that prison, she is one of our top officers,” or words to that effect.

113. Lieutenant Curtis and Captain Armstrong responded that Ms. Crockett had no issues during her time at Augusta Correctional Center.

114. Warden Anderson told Ms. Crockett that he did not care if Ms. Crockett gave a statement to anyone at Augusta but indicated that she should give a statement to SIU Investigator Shaun McDaniel.

115. Ms. Crockett wrote and submitted the statement that evening to SIU Investigator McDaniel, while at Augusta Correctional Center, in the presence of Lieutenant Curtis who was there with her.

116. Ms. Crockett had cried to the point that she could not be around inmates.

117. Ms. Crockett requested that a car be sent for her, or she would call for her husband to come get her.

118. Ultimately, Ms. Crockett’s husband came and picked her up.

119. In a follow-up call with Warden Anderson after Ms. Crockett left the facility, Warden Anderson told Ms. Crockett to go home, get some sleep, and then come and see him the following day.

120. Thus, on the morning of Monday, February 6, 2023, Ms. Crockett went to Warden Anderson’s office, who also had the Assistant Warden present.

121. Warden Anderson directed Ms. Crockett to tell him what happened and asked, “what will it take to make you happy?”, “what do you want out of this?”, “what will it take to keep this quiet?,” or words to that effect.

122. Ms. Crockett responded to Warden Anderson that she just wanted the same hours, same pay, and so forth.

123. Warden Anderson responded, “you are making more money than the wardens,” to which Ms. Crockett indicated that it was tough, though, being away from her family for 7 days at a time, with frequency, and she had been doing it for the money.

124. Warden Anderson indicated that, while the incident was under investigation, Ms. Crockett could work at River North.

125. Ms. Crockett left Warden Anderson’s office and went to seek medical attention, ultimately being diagnosed with PTSD that day, February 6, 2023.

126. At this time, Ms. Crockett informed Warden Anderson and her colleagues at River North Correctional Center about her PTSD diagnosis.

127. When Ms. Crockett spoke with SIU Investigator Shawn McDaniel, he told Ms. Crockett, “Without disclosing too much information, had Mr. Watkins been dealt with the first few times, you would never have gone through this. And I’m so sorry you went through this.”

128. The investigation ultimately concluded on March 14, 2023.

129. Once the investigation concluded, Warden Anderson, who was aware of Ms. Crockett's PTSD diagnosis, indicated to Ms. Crockett that he had bad news — the only "solution" Warden Newcomer would allow is that, (1) Ms. Crockett was never allowed to work at Augusta Correctional Center while Newcomer is Warden, and (2) the only facility in the entire state of Virginia Newcomer would agree that Ms. Crockett could rove at (in order to keep her higher pay) was Sussex I, the worst correctional center in Virginia, which was also 5 hours away from Ms. Crockett's home and family.

130. Warden Anderson indicated that he thought it was safest for Ms. Crockett to take the pay cut of almost $50,000 per year and stay at River North. Ms. Crockett was informed by Warden Anderson with regard to Sussex I, "it's a gang prison, being run by gang members".

131. Ms. Crockett requested to rove at Greensville, but was denied as Warden Anderson told Ms. Crockett that Warden Newcomer would only agree to her continuing to rove if it was at Sussex I.

132. Ms. Crockett spoke with her husband and decided she was going to try working at Sussex I, despite the dangers, to keep the pay.

133. Thus, Ms. Crockett finished her current contract at Sussex I from March 6-24, 2023.

134. Ms. Crockett then received a new, six-month roving contract and worked at Sussex I, beginning March 25, 2023.

135. Then, in approximately May 2023, in the middle of Ms. Crockett's roving contract, Ms. Crockett received notice of a change to the roving program, which was to take effect in the summer of 2023, indicating that correctional officers could not rove outside their region anymore.

136. The only available correctional center offering roving within Ms. Crockett's region was Augusta Correctional Center, from which Warden Newcomer had banned Ms. Crockett due to her reaction to being held hostage and assaulted — a reaction that was entirely normal, but which Warden Newcomer apparently thought was caused by Ms. Crockett being female.

137. In response to learning this news, Ms. Crockett called Regional Manager Roger Walz.

138. Ms. Crockett also met Warden McCoy at Sussex I on three occasions to discuss staying at Sussex I on the roving contract.

139. Ms. Crockett also called Dana Harty in HR and Western Regional Administrator Lisa Hernandez.

140. Ms. Crockett was informed by Human Resources that it should not be a problem for Ms. Crockett to remain at Sussex I as, given what happened to Ms. Crockett at Augusta Correctional Center, an exception to the new policy should be made for her. Ms. Crockett was also informed that the DOC was so understaffed at the facilities on the roving list that DOC would not stop Ms. Crockett from being able to rove.

141. Despite all these representations, when Ms. Crockett requested to continue in the roving program, Ms. Crockett was informed in June 2023 that she was not being given a roving contract and therefore was being terminated from the roving program, which resulted in an approximate $50,000 per year loss to Ms. Crockett.

142. The east region was still short approximately 60 officers at the time Ms. Crockett was denied a roving contract.

143. Warden Anderson told Ms. Crockett that Warden Newcomer stated that as long as Warden Newcomer was Warden at Augusta Correctional Center, Ms. Crockett was never allowed back on the property.

144. Warden McCoy told Ms. Crockett that it came directly from Warden Newcomer that Ms. Crockett was not going to be allowed to stay at Sussex I. Warden McCoy indicated that they had a wardens' meeting, and Warden McCoy told Ms. Crockett that he would do whatever it took to speak up for her, but Warden Newcomer said no way. Warden McCoy told Ms. Crockett that he didn't know what she had done to Mr. Newcomer, but that Mr. Newcomer said no way to Ms. Crockett staying at Sussex I.

145. In or about November 2023, Warden Newcomer was moved to a new prison. Based upon information relayed to Ms. Crockett, it has been alleged that the move was due to an issue that was finally addressed with regard to how Warden Newcomer treats women.

146. In June 2023, Ms. Crockett reported to Lisa Hernandez, Western Regional Administrator, Warden Newcomer's supervisor, that she believed she was being retaliated against due to her legitimate reaction to Officer Watkins' threats of violence, which as stated, Warden Newcomer apparently thought was caused by Ms. Crockett being female — she graduated with honors from the academy, was approaching her second year with DOC, was never late, had perfect attendance, had successfully worked in 3 institutions without a verbal counseling, substandard, or group notice, and the other individuals who received roving contracts had disciplinary issues, unlike Ms. Crockett.

147. For example, Officer Holt, who was provided a roving contract, had disciplinary paperwork for bringing items inside the prison and was written up for not completing training.

148. Moreover, everyone from the west roving at Sussex I when the policy changed was moved back to Augusta Correctional Center, except Ms. Crockett.

149. Ms. Crockett was informed by Lisa Hernandez that it was Warden Newcomer's, along with Regional Manager Roger Walz's and the Augusta team's, decision to deny her a roving contract.

150. However, Ms. Crockett has since learned that Walz was not a decisionmaker.

151. The decisionmaker was Warden Newcomer.

152. Ms. Crockett was informed directly, "You were not recommended for a roving contract at Augusta because of the incident that occurred in February 2023," which again Warden Newcomer apparently thought was caused by Ms. Crockett being female, while she was simultaneously informed that Warden Anderson speaks highly of her and believes she has a "bright future with the VADOC."

153. Ms. Crockett has since learned that Warden Newcomer falsely stated that she had received a substandard when justifying to other DOC management his refusal to allow Ms. Crockett to work at his facility. Warden Newcomer's explanation was factually false. Ms. Crockett has never been issued a substandard.

154. After being denied a roving contract, and after reporting the gender discrimination to Ms. Hernandez, in June 2023, Ms. Crockett asked to do anything to keep the extra pay, including staying at Sussex I with roving pay, regardless of whether it was formal roving.

155. Even in response to this, Ms. Crockett was not permitted to stay at Sussex I with the additional pay.

156. Warden Newcomer and Ms. Hernandez spoke weekly.

157. When Ms. Crockett's request to keep her pay was denied, Ms. Crockett asked to do anything to keep the seven on/seven off schedule, because that was what her body had adjusted to.

158. Ultimately, Ms. Crockett was moved to Cold Springs Correctional Unit in the beginning of July 2023.

159. Two weeks into Ms. Crockett's placement at Cold Springs Correctional Unit, she was drafted to go to Augusta Correctional Center for a week.

160. Despite Warden Newcomer not permitting Ms. Crockett to make extra money to rove at Augusta Correctional Center, Warden Newcomer had no problem with Ms. Crockett working at Augusta Correctional Center for normal pay pursuant to a draft.

161. In a further effort to adversely impact her compensation, Warden Newcomer, who was required to approve overtime, indicated that Ms. Crockett would never be approved for overtime while at Augusta Correctional Center.

162. Thus, Ms. Crockett was welcome to work at Augusta Correctional Center for the lowest pay, but she was not allowed to work there roving or on overtime, receiving more pay.

163. Superintendent Redmond at Cold Springs told Ms. Crockett that he thought Warden Newcomer was going to send her back, but Superintendent Redmond was going to tell Warden Newcomer that he does not get to pick his officers.

164. Ms. Crockett received a lot of attention that week at Augusta Correctional Center and was informed that she was there because she had been flagged as a different Crockett.

165. During Ms. Crockett's week at Augusta Correctional Center, Ms. Crockett learned that none of the supervisors to whom she had reported the events on February 1, 2023 were disciplined for failing to report the matter.

166. Ms. Crockett has since confirmed that none of the supervisors to whom she had reported the events on February 1, 2023 were disciplined for failing to report the matter.

167. Instead, Ms. Crockett was informed that sending Ms. Crockett away was supposed to have "taken care of the issue." Ms. Crockett was further informed that this "solution" was decided at a supervisors meeting, and Warden Newcomer was the decisionmaker.

168. Ms. Crockett also learned that Officer Watkins had gone home from the February 1, 2023 shift and abused his girlfriend so badly that she sought treatment in a psychiatric ward.

169. Moreover, Ms. Crockett learned that Officer Watkins exhibited this violent behavior before she was required to work with him, and the prison knew of his violent behavior due to reports that had been made, yet Warden Newcomer did nothing to stop or prevent Officer Watkins' harassment.

170. Ms. Crockett has been told that it is perceived that she "snitched" because she is female, and thus she was nicknamed the "snitch bitch" at DOC. Every time Ms. Crockett arrived at a new facility after the February 2023 event, when employees realized what her name was, employees made statements to Ms. Crockett such as, "You're here. You are that girl. The snitch bitch," or words to that effect. Ms. Crockett heard this nickname frequently. "Bitch" is a commonly understood slur that relates only to the female gender.

171. Due to the events Ms. Crockett has endured, she has been diagnosed with PTSD, complex PTSD, and panic disorder.

172. To this day, Ms. Crockett is triggered by certain events, such as learning a mass shooting has occurred.

173. After these events, Ms. Crockett frequently became sick due to the stress, stopped sleeping, golfing, fishing, and going to church, until it reached the point that Ms. Crockett suffered

a complex PTSD breakdown, also known as PTSD disassociation, in August 2023. When the complex PTSD breakdown started, Ms. Crockett reported her symptoms to Sergeant Larry Davis and Lieutenant Veet at Cold Springs Correctional Center, including reporting that her brain was not functioning properly and that something was wrong.

174. Ms. Crockett had to go on short-term disability for 2 months thereafter.

175. Ms. Crockett returned to work in October 2023.

176. Upon her return, Ms. Crockett made her supervision aware, at each of the institutions at which she worked thereafter, of her PTSD diagnosis. This includes but is not limited to Major Stokes, Major Randozzo, Superintendent Redman, Warden Aldridge, Lieutenant Woodson, and Lieutenant Christian.

177. On or about January 10, 2024, Ms. Crockett filed a Charge of Discrimination with the Equal Employment Opportunity Commission making a report of gender discrimination, sexual harassment, and retaliation. The Charge also disclosed that Ms. Crockett has PTSD, complex PTSD, and panic disorder.

178. Warden Newcomer learned of Ms. Crockett's filing in January 2024.

179. Ms. Crockett also provided a Preservation of Evidence Letter to the DOC, enclosing a copy of the EEOC Charge, dated January 10, 2024. The following individuals were directed to be notified of Ms. Crockett's claims and need for preservation: Officer Watkins, Warden Anderson, Warden Newcomer, Roger Walz, Shaun McDaniel, Lisa Hernandez, Linda Joyner, Lucinda R. Childs-White, Sgt. Johnson, Captain Burgandine, Lt. Scott, Sgt. Tharp, Capt. Arnold, Lt. Curtis, and Lt. Armstrong.

180. In July 2024, Ms. Crockett began participating in the Fluvanna Transportation Team Pilot Program, Team A.

181. Ms. Crockett made Warden Aldridge at Fluvanna aware of her PTSD diagnosis upon her placement at Fluvanna in July 2024.

182. Ms. Crockett also informed Lieutenant Woodson upon her placement at Fluvanna that due to her diagnosis of complex PTSD she was unable to tolerate being inside small, closed areas.

183. Thereafter, in the first week at Fluvanna, in July 2024, Ms. Crockett, after a meeting concluded, went to grab her duty belt from another area of the prison, after informing management where she was going and why. Lieutenant Woodson then directed Officer Jarvis Jackson to hold Ms. Crockett in the small sallyport area, despite there being no cause to do so.

184. Lieutenant Woodson was laughing while Ms. Crockett was starting to have a panic attack due to being confined in the small space. Ms. Crockett reported contemporaneously with the detention that she needed to be let out as she had PTSD and detaining her in a sallyport was problematic. Ms. Crockett still was not released from the sallyport.

185. Corrections Officer Lina Davis-Whyte witnessed this event and has confirmed that "everyone knew that Officer Crockett had an episode due to being locked in a small space before" (Ex. B).

186. The following day, Ms. Crockett went to Warden Aldridge and Tammy Via in HR and reported the discrimination and harassment based upon her disability. Warden Aldridge's secretary told Ms. Crockett that Warden Aldridge would get back with her, but he never did. In response to Ms. Crockett's HR report, Ms. Crockett was told that the DOC was not going to permit her to file a grievance or start a paper trail, instead Ms. Crockett's report was going to be handled in-house with the Lieutenant. However, it was not handled as Lieutenant Woodson continued to harass Ms. Crockett thereafter, as set out below.

Case 5:24-cv-00084-JHY-JCH Document 73 Filed 05/14/26 Page 25 of 45
Pageid#: 802

187. After this event, Ms. Crockett ensured that everyone that she worked with was aware of her PTSD diagnosis and indicated that detaining her in the sallyport as a horrible joke due to her inability to tolerate being in small spaces based upon the same was not right.

188. In September 2024, Lieutenant Woodson then took some of Officer Crockett's cotton uniforms from her, the cotton dress blues, which Ms. Crockett needed to accommodate her psoriasis disability, which Lieutenant Woodson was aware of and despite the uniforms being issued to Officer Crockett by her home prison. Officer Crockett had been wearing the dress blues cotton uniform since she had been accepted at the program at Fluvanna, without incident. This left Ms. Crockett with only blue and grey cotton uniforms.

189. Then, in February 2025, Major Stokes from Augusta transferred to Fluvanna as Augusta had recently been shut down.

190. Thereafter, Ms. Crockett was severally harassed by Major Stokes.

191. In or around February 2025, Ms. Crockett put her ADA accommodation requests on file related to her psoriasis (cotton uniforms instead of polyester uniforms), PTSD (no tight spaces), and migraines (glasses) because the harassment against Ms. Crockett escalated after Major Stoke transferred from Augusta to Fluvanna.

192. As stated, Ms. Crockett has psoriasis and therefore needed the accommodation of wearing cotton rather than polyester uniforms. Ms. Crockett had been issued cotton uniforms while at River North Correctional Center to accommodate her psoriasis. As Lieutenant Woodson had taken Ms. Crockett's cotton dress blues, Ms. Crockett only had blue and grey cotton uniforms to wear at this time. Ms. Crockett had no issue wearing the blue and grey cotton uniform until Major Stokes, who was aware of Ms. Crockett's disabilities, transferred from Augusta to Fluvanna.

193. Thereafter, Officer Crockett was publicly called out and was bullied about the blue and grey cotton uniform in a formation meeting by Captain Sacra, and Officer Crockett was told that she was not going out on transportation due to wearing her work uniform. (Ex. B).

194. While Ms. Crockett had been contracted to be a transportation officer, transporting inmates to locations outside the prison, she was instead placed in a special housing unit, RHU, by Captain Sacra. RHU is in essence “the hole” where inmates who are misbehaving are placed and is a much rougher position as compared to transportation. There was no legitimate reason to place Ms. Crockett in RHU instead of transport. Captain Sacra told Ms. Crockett, in front of her colleagues, that she was being put in RHU as “punishment” until she worse the polyester unforms (which broke out Ms. Crockett due to her psoriasis).

195. Thus, Ms. Crockett was not permitted to work in her normal role in her accommodation uniform, which effectively denied her accommodation request.

196. Supervision was well aware that Officer Crockett was wearing the only uniform the Virginia Department of Corrections had let her have at that time that accommodated her disability. (Ex. B).

197. Many officers at Fluvanna were permitted to wear the same blue and grey cotton uniform, and Officer Crockett had been wearing the cotton uniform since she had been accepted at the program at Fluvanna, without incident. (Ex. B).

198. Corrections Officer Lina Davis-Whyte informed Ms. Crockett that Lieutenant Haight reported in Monday supervision meetings that supervision was to stay on Ms. Crockett about her uniform because Ms. Crockett is known as “trouble.” The reference to “trouble” was Ms. Crockett’s reports of disability and gender discrimination and retaliation.

199. Officer Crockett begged for her dress blues cotton uniforms to be returned to her, but they were not.

200. Around February 2025, Ms. Crockett reported the failure to accommodate to Warden Aldridge, Assistant Warden Thomas, and Major Stokes, who laughed in Ms. Crockett's face.

201. Further, Ms. Crockett has migraines and therefore needed the accommodation of wearing sunglasses. Ms. Crockett was accommodated in this regard until Augusta leadership moved to Fluvanna in February 2025, at which point she was harassed about the sunglasses and told to remove the sunglasses, thereby denying her accommodation. Many other officers in the facility were wearing sunglasses, at the same time Ms. Crockett was told that she had to remove the sunglasses.

202. Corrections Officer Lina Davis-Whyte witnessed Captain Sacra call out Ms. Crockett in a meeting for wearing sunglasses (due to her migraines), yet others that were also wearing sunglasses were not called out. (Ex. B).

203. Specifically, Captain Sacra stated to Ms. Crockett, "Who the hell do you think you are in my briefing with your glasses on your hat," or words to that effect. There were approximately six other officers with sunglasses on their hat at the time, all male, except for Ms. Crockett. Upon information and belief, and after a reasonable inquiry, the other officers were not wearing sunglasses due to a disability.

204. Prior to this event, Ms. Crockett had made her supervision aware of her need to wear sunglasses to accommodate her migraine disability.

205. When Ms. Crockett reported the discrimination to Warden Aldridge, reiterating her migraine disability need for accommodation, Warden Aldrige responded, “funny, you are giving me a headache.”

206. Corrections Officer Lina Davis-Whyte informed Ms. Crockett that Captain Sacra was informed by Warden Aldridge to “ride Ms. Crockett until she was gone,” or words to that effect.

207. Corrections Officer Lina Davis-Whyte witnessed this mistreatment and reported the harassment to Warden Aldridge. (Ex. B).

208. However, Corrections Officer Lina Davis-Whyte report did not change anything. (Ex. B). The discrimination and harassment continued thereafter.

209. Ms. Crockett was told by Lt. Spencer (female) that if she “thought about being bisexual, it may be easier for” her, or words to that effect.

210. Officer Lina Davis-Whyte has stated under oath, “It was obvious, based on everything I personally observed, that management targeted only Officer Crockett.” (Ex. B).

211. As Officer Lina Davis-Whyte has further stated under oath, “Officer Crockett was a trooper putting up with what she did. She wanted to work. She came to work, to work. The Virginia Department of Corrections needs more loyal officers like Officer Crockett.”

212. Between July 2024 and April 2025, Ms. Crockett went to HR four times to talk about the gender and disability discrimination, harassment, and retaliation that she was experiencing as set forth above. Ms. Crockett made HR aware of her disabilities.

213. Ms. Crockett was turned away by HR four times and was told that the gender and disability discrimination, and harassment and retaliation should be handled in-house instead of through grievances.

214. During this same time frame, Ms. Crockett also called HR at her home facility to seek help regarding the gender and disability discrimination, harassment, and retaliation set forth above that she was experiencing; HR told Ms. Crockett, "Don't waste your time calling in here anymore. All you are is a personnel file."

215. Ms. Crockett also heard HR personnel from her home facility refer to her as a "bitch" when the HR personnel did not realize that she was on the phone.

216. Ultimately, Ms. Crockett ended up at UVA having a panic attack on April 9, 2025 and had to seek care at UVA based on the treatment she was enduring at work.

217. When Ms. Crockett has a panic attack, she feels like she is having a heart attack, her blood pressure rises to unsafe levels, she loses control of her bowel and bladder, and she profusely vomits.

218. Ms. Crockett had another panic attack at work on April 21, 2025. The panic attack was caused because Ms. Crockett had gone to HR to grieve the lack of disability accommodation for her uniform related to psoriasis and her glasses for migraines, but yet again HR would not initiate the grievance process, telling Ms. Crockett instead that she had to handle her report through lower management, and when Ms. Crockett sought help from Warden Aldridge about the disability discrimination and failure to permit her to grieve the discrimination, she was shut down.

219. Ms. Crockett ultimately decided to return to Cold Springs because of the harassment.

220. However, when Ms. Crockett returned to Cold Springs, she learned that Cold Springs was now staffed by approximately 70% of the prior workers from Augusta, and the officers were staying in touch with Warden Newcomer.

221. The harassment was therefore even worse at Cold Springs.

222. Ms. Crockett was oddly informed that she could not speak to night shift at Cold Springs.

223. Then during the first week at Cold Springs, in approximately April-May 2025, Ms. Crockett was called into HR and reprimanded for an alleged “unprofessional” conversation with the Major based on the allegation that the conversation was not a conversation that could be held around inmates, yet the conversation in no way could have been viewed as objectively or subjectively unprofessional, and if it were to be, the Major would have been equally at fault.

224. Ms. Crockett was then sent to Nottoway with a Sergeant who was known to drink on the job, who lost the key to the van, and then left Ms. Crockett in the yard with 6 inmates and two weapons, which was completely against policy, while Ms. Crockett had to watch a female inmate getting stabbed in the face with no ability to intervene and stop it due to being alone. Ms. Crockett was then threatened with another reprimand.

225. Ms. Crockett was not back at Cold Springs for two weeks before she had another panic attack in approximately May 2025.

226. Therefore, Ms. Crockett ended up having to go out on short-term disability again in or around May-June 2025.

227. Ms. Crockett was required to call into Cold Springs HR weekly after this, despite being on protected medical leave.

228. The DOC then terminated Ms. Crockett’s employment on or about until November 26, 2025 due to her inability to work, which was caused by the DOC’s discrimination, harassment, and retaliation.

229. Ms. Crockett entered the DOC as a happy, healthy, productive employee. Ms. Crockett is now a shell of the person she used to be due to what she experienced at the DOC and currently has trouble even leaving her home.

**COUNT I: CLAIM FOR DISCRIMINATION, HOSTILE WORK ENVIRONMENT, FAILURE TO ACCOMMODATE, AND RETALIATION IN VIOLATION OF THE REHABILITATION ACT OF 1973**

230. Ms. Crockett hereby incorporates by reference as if set forth fully herein the preceding paragraphs of this Third Amended Complaint.

231. The Commonwealth of Virginia and the Virginia Department of Corrections receive Federal financial assistance as defined in 29 U.S.C. § 794.

232. Ms. Crockett is a qualified individual with disabilities, including PTSD, complex PTSD, panic disorder, psoriasis, and migraines under the Rehabilitation Act.

233. At all times relevant to the Third Amended Complaint, Ms. Crockett was a qualified individual who could perform the essential functions of her job as contemplated by the Rehabilitation Act.

234. Ms. Crockett requested the accommodations of not being placed in tight spaces, wearing cotton uniforms, and wearing sunglasses. While Ms. Crockett had initially been afforded these accommodations by her leadership, as she was beginning to be denied accommodation starting in September 2024 and ramping up in February 2025, Ms. Crockett officially put her ADA requests on file in February 2025.

235. It was not an undue hardship on the Commonwealth of Virginia and the Virginia Department of Corrections to accommodate Ms. Crockett with regard to tight spaces, cotton uniforms, and sunglasses.

236. Ms. Crockett could perform the essential functions of her job with the foregoing

accommodations.

237. However, Ms. Crockett was still placed in small spaces, had her cotton uniforms taken from her and then was told that she could not work her normal job in the only cotton uniform she was permitted to have, and instead had to work a worse job, and was told she could not wear the sunglasses. Thus, Ms. Crockett's requests for accommodation were denied.

238. In addition to the protected activity of requesting accommodations, Ms. Crockett also filed a charge of discrimination with the EEOC in January 2024 detailing her disabilities, in July 2024, Ms. Crockett reported to Warden Aldridge and Tammy Via in HR that she was experiencing disability discrimination, around February 2025, Ms. Crockett reported the failure to accommodate to Warden Aldridge, Assistant Warden Thomas, and Major Stokes, who laughed in Ms. Crockett's face, and then from July 2024 through April 2025, Ms. Crockett reported to HR, at least four times, gender and disability discrimination and retaliation and also made additional reports of gender and disability discrimination and retaliation to her home prison HR.

239. The individuals taking the discriminatory and retaliatory actions were aware of Ms. Crockett's disabilities at the time of their discriminatory and retaliatory actions. By way of example, in February 2023, Ms. Crockett told Warden Anderson and colleagues at River North about her PTSD diagnosis. In August 2023, Ms. Crockett told Sgt. Davis and Lt. Veet at Cold Springs of her symptoms of her complex PTSD. Beginning in October 2023 and continuing until the end of her employment thereafter, Ms. Crockett told the leadership at each facility at which she worked about her PTSD diagnosis, and this includes, but is not limited to, Major Stokes, Major Randozzo, Superintendent Redman, Warden Aldridge, Lieutenant Woodson, and Lieutenant Christian. In January 2024, Ms. Crockett filed an EEOC Charge disclosing her PTSD diagnosis, which Warden Newcomer and others learned of at that time. In July 2024, Ms. Crockett told all

her colleagues at Fluvanna about her PTSD diagnosis. While at Fluvanna, from July 2024 until April 2025, Ms. Crockett made her supervision, including but not limited to, Warden Aldrige, Major Stokes, Lieutenant Woodson, Captain Sacra, and Assistant Warden Thomas, aware of each of her disabilities. Ms. Crockett also put her ADA requests on file regarding all her disabilities in February 2025.

240. With regard to adverse actions and materially adverse actions:

a. In March 2023, Ms. Crockett was only permitted to rove at Sussex I.

b. In June 2023, Ms. Crockett was denied a roving contract.

c. In June 2023, Ms. Crockett was denied her request to stay in a role that would permit the extra pay that she had been making.

d. In July 2023, Ms. Crockett was denied overtime during the week she was drafted to work at Augusta.

e. From July 2024 until Ms. Crockett went on short-term disability leave in approximately May-June 2025, Ms. Crockett was subjected to a discriminatory and retaliatory hostile work environment, which included but is not limited to the following actions and inactions, in July 2024, being locked in a small space after requesting the accommodation of not being in small spaces due to PTSD, complex PTSD, and panic disorder, while management laughed at her, from September 2024 to April 2025, being harassed and having her cotton uniforms taken from her so that she could not wear them after requesting the accommodation of wearing cotton uniforms for psoriasis, in February 2025 being assigned to RHU as punishment related to her need for cotton uniforms and because she was perceived as trouble due to her reports of disability discrimination and requests for accommodation, in

approximately February 2025, being told to remove her sunglasses and she could not wear her sunglasses after requesting the accommodation of wearing sunglasses for migraines, comments made about her disabilities, such as when she discussed her need for accommodation related to her migraines and management's response was that she was giving management a headache, refusing to permit her to file grievances from July 2024 until Ms. Crockett went on short-term disability leave in approximately May-June 2025, and issuing unwarranted reprimands to her in April-May 2025, all of which together rose to the level that Ms. Crockett was forced to take medical leave, ultimately resulting in the termination of her employment.

241. The harassment of Ms. Crockett was unwelcome.

242. There were no legitimate reasons for the actions taken against Ms. Crockett. Ms. Crockett was a great Officer. Ms. Crockett was told that the harassment was due to her disabilities, such as Captain Sacra's statement that Ms. Crockett was being denied the ability to work in her normal role as "punishment" until she wore the polyester uniforms. Ms. Crockett was labeled as "trouble" due to her need for accommodation and reports of discrimination and harassment. Management was told to "ride" Ms. Crockett until she was gone.

243. Not only was the discrimination and harassment being carried out by the DOC's management, Ms. Crockett reported the discrimination and retaliation she was enduring to HR and leadership many times between July 2024 and when Ms. Crockett went on short-term disability leave in approximately May-June 2025, all to no avail. Thus, the hostile work environment that Ms. Crockett endured is imputable to the DOC.

244. As a direct and proximate result of the Commonwealth of Virginia and the Virginia Department of Corrections' actions, Ms. Crockett has suffered and will continue to suffer

pecuniary losses.

245. The Commonwealth of Virginia and the Virginia Department of Corrections acted at all times with malice or reckless indifference to the statutorily protected rights of Ms. Crockett.

246. The Commonwealth of Virginia and the Virginia Department of Corrections have violated Ms. Crockett's rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, oppressively, maliciously, fraudulently, or with reckless disregard for Ms. Crockett's rights.

247. The above-described acts by the Commonwealth of Virginia and the Virginia Department of Corrections and employees of the Commonwealth of Virginia and the Virginia Department of Corrections constitute disability discrimination, hostile work environment, failure to accommodate, and retaliation in violation of the Rehabilitation Act.

## COUNT II: TITLE VII GENDER DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

248. Ms. Crockett hereby incorporates by reference as if set forth fully herein the preceding paragraphs of this Third Amended Complaint.

249. At all times material hereto, the Commonwealth of Virginia and the Virginia Department of Corrections were each a "person" within the meaning of Title VII, Section 701, 42 U.S.C. § 2000e(a). At all times material hereto, the Commonwealth of Virginia and the Virginia Department of Corrections were each an "employer" within the meaning of Title VII, Section 701, 42 U.S.C. § 2000e(b). Plaintiff, at the times relevant, was an "employee" of the Commonwealth of Virginia and the Virginia Department of Corrections within the meaning of Title VII, Section 701, 42 U.S.C. § 2000e(f).

250. In violation of Title VII of the Civil Rights Act of 1964, as amended, the Commonwealth of Virginia and the Virginia Department of Corrections harassed and discriminated against Plaintiff on the basis of her gender, and subjected her and other women to gender

Case 5:24-cv-00084-JHY-JCH Document 76 Filed 05/26/26 Page 36 of 45
Pageid#: 813

stereotyping, by all of their acts as set forth above, which are incorporated herein, and which include, but are not limited to, preventing Ms. Crockett from roving at Augusta Correctional Center, only permitting Ms. Crockett to rove at Sussex I, thereafter refusing to grant Ms. Crockett a roving contract, refusing to let Ms. Crockett continue working in a role with the same pay she had been earning, denying Ms. Crockett the opportunity to work overtime hours when she was drafted to work at Augusta, and subjecting Ms. Crockett to an unwelcome hostile work environment due to her gender, including referring to her as a bitch and a snitch bitch frequently over a period of years, calling her a “big girl” or “big bitch”, having male inmates masturbate in unison in front of her to make “milk” for cereal, being informed by Sgt. Madda that she was under a magnifying glass because she was female, being told by two Lieutenants and one Sergeant that women are treated differently at the DOC because they are perceived to only be there to bring in drugs and sleep with inmates, being told by male supervisors not to show emotion when the same statements were not made to male officers, being told by two Sergeants and an Officer that Warden Newcomer stereotyped women, only liked women who were “cute” and treated “cute” women better, placing Ms. Crockett in the back of the prison (the worst place) while the “cute” female officers were placed in medical and with their significant others, requiring women to sleep there way into positions and better treatment, which Ms. Crockett refused to do, while men were not similarly required to sleep there way into positions and better treatment, being told that if she was bisexual things would be easier on her, being told that Augusta was not a good place for female officers to work, being placed to work with an irate male officer under the gender stereotype that being a female she would not fight back, making the male officer even more volatile, being told by a Sargeant to be careful with reporting harassment by Officer Watkins because Ms. Crockett was female, and being told by male supervisors that writing a truthful statement identifying

negative behavior is especially problematic as a female in the DOC, in fact it was referred to as a death knell. The foregoing actions were severe and pervasive and persisted despite many reports by Plaintiff.

251. There were no legitimate reasons for the actions taken against Ms. Crockett. Ms. Crockett was a great Officer. The Commonwealth of Virginia and the Virginia Department of Corrections would not have taken the foregoing discriminatory actions had Plaintiff been male and had the same reaction to the disturbing incident that she encountered in the workplace. Ms. Crockett was informed directly, “You were not recommended for a roving contract at Augusta because of the incident that occurred in February 2023,” which Warden Newcomer apparently thought was caused by Ms. Crockett being female, while she was simultaneously informed that Warden Anderson speaks highly of her and believes she has a “bright future with the VADOC.” Warden Newcomer has also engaged in a pattern and practice of disparately treating female employees. Ms. Crockett has been treated differently as a female in the DOC throughout her employment. There was a substantial need for roving officers at the time Ms. Crockett was denied the ability to rove. Moreover, Warden Newcomer provided a false, pretextual reason to support his refusal to permit Ms. Crockett to rove, to wit, that Ms. Crockett had been issued a substandard, a type of disciplinary action, which she had not been issued. Not to mention, officers who had in fact been issued discipline were still selected to rove over Ms. Crockett. Ms. Crockett was the only officer not permitted to return to roving at Augusta.

252. As a direct and proximate result of the Commonwealth of Virginia and the Virginia Department of Corrections’ actions, Plaintiff has suffered and will continue to suffer loss of employment, pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

253. The above-described acts of the Commonwealth of Virginia and the Virginia Department of Corrections constitute sex discrimination and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.*

**<u>COUNT III: TITLE VII RETALIATION</u>**

254. Ms. Crockett hereby incorporates by reference as if set forth fully herein the preceding paragraphs of this Third Amended Complaint.

255. At all times material hereto, the Commonwealth of Virginia and the Virginia Department of Corrections were each a “person” within the meaning of Title VII, Section 701, 42 U.S.C. § 2000e(a). At all times material hereto, the Commonwealth of Virginia and the Virginia Department of Corrections were each an “employer” within the meaning of Title VII, Section 701, 42 U.S.C. § 2000e(b). Plaintiff, at the times relevant, was an “employee” of the Commonwealth of Virginia and the Virginia Department of Corrections within the meaning of Title VII, Section 701, 42 U.S.C. § 2000e(f).

256. Ms. Crockett reported gender discrimination to Lisa Hernandez in June 2023, filed an EEOC charge related to gender discrimination, sexual harassment, and retaliation in January 2024, and from July 2024 through April 2025, Ms. Crockett reported to HR, at least four times, gender and disability discrimination and retaliation and also made additional reports of gender and disability discrimination and retaliation to her home prison HR.

257. The Commonwealth of Virginia and the Virginia Department of Corrections retaliated against Plaintiff as follows:

a. In June 2023, Ms. Crockett was denied her request to stay in a role that would permit the extra pay that she had been making.

b. In July 2023, Ms. Crockett was denied overtime during the week she was drafted

to work at Augusta.

c. From June 2023 and continuing thereafter, Ms. Crockett was subjected to a retaliatory hostile work environment, including referring to her as a bitch and a snitch bitch frequently over a period of years, and being severely harassed at Fluvanna and Cold Spring as set forth above, which result in the termination of Ms. Crockett's employment. The foregoing actions were unwelcome, severe and pervasive, and persisted despite many reports by Plaintiff.

258. There is no legitimate reason for the Commonwealth of Virginia and the Virginia Department of Corrections' retaliatory actions. For example, Ms. Crockett graduated with honors from the academy, has been with the VDOC for several years, has great attendance, has successfully worked in several institutions without a verbal counseling, substandard, or group notice.

259. The foregoing retaliation happened in close temporal proximity to Ms. Crockett's protected reports.

260. Management was told to ride Ms. Crockett until she was gone.

261. The retaliatory harassment was ongoing and escalated as Ms. Crockett continued to report these matters internally and externally.

262. As a result of the Commonwealth of Virginia and the Virginia Department of Corrections' retaliatory acts, Plaintiff has suffered and will continue to suffer pecuniary loss, mental anguish, pain and suffering, shame, humiliation, embarrassment, loss of enjoyment of life, and other non-pecuniary loss.

263. The above-described acts of the Commonwealth of Virginia and the Virginia Department of Corrections constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.*

WHEREFORE, Plaintiff Nancy Crockett prays for judgment against Defendants Commonwealth of Virginia and Virginia Department of Corrections, jointly and severally, and for equitable relief, injunctive relief, compensatory damages, including emotional pain and suffering damages, pecuniary loss, including lost wages and benefits, front wages and benefits, and out-of-pocket medical expenses, and for costs, attorneys' fees, and post-judgment interest, and for such other and further relief as may be just and equitable.

TRIAL BY JURY IS DEMANDED.

Respectfully Submitted,

NANCY CROCKETT,

By:____/s/____________________________
Brittany M. Haddox (VSB No. 86416)
HADDOX LAW
1203 Texas Street
Salem, VA 24153
brittany@haddox.law
540-765-4284
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May 2026, the foregoing was filed using the Court's CM/ECF system, which sent notice of the same to all counsel of record.

*/s/ Brittany M. Haddox*

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Richmond Local Office**
400 N. Eight Street, Suite 350
Richmond, VA 23219
(804) 362-6910
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/26/2024

**To:** Nancy Crockett
[redacted]

Charge No: 438-2024-00669

EEOC Representative and email: QWONNESHIA KING
Investigator
qwonneshia.king@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 438-2024-00669.

On behalf of the Commission,

Daron L. Calhoun
Local Office Director

**Cc:**
Pamela Zaremba
Virginia Department of Corrections - Commonwealth of Virginia
6900 Atmore Drive
Richmond, VA 23225

Brittany Haddox
Strelka Employment Law
1203 Texas Street
SALEM, VA 24153

Please retain this notice for your records.

**DECLARATION**

I, Lina Davis-Whyte, under penalty of perjury, declare as follows:

1. I make this declaration based on my personal knowledge.
2. I have been a Corrections Officer with the Virginia Department of Corrections since 2003. I am still employed with the Virginia Department of Corrections.
3. I first met Officer Nancy Gail Crockett when she worked at the Fluvanna Correctional Center for Women. Both Officer Crockett and I had home prisons and were contracted to work at Fluvanna through the Fluvanna Transportation Team Pilot Program. I still participate in the same program, although now it is referred to as a roving program.
4. Officer Crockett was the highlight of my day and many others who worked at the Fluvanna Correctional Center for Women, including certain members of leadership, such as Major Elliott. Officer Crockett always came in with a bubbly smile and cared if you were sad or worried about something.
5. I witnessed mistreatment of Officer Crockett.
6. Officer Crockett had a medical condition that caused her to break out in a rash if she wore a particular fabric, polyester.
7. I saw the rash that Officer Crockett got when she wore a polyester instead of cotton uniform.
8. Officer Crockett's home prison issued her a cotton uniform.
9. Officer Crockett wore it at Fluvanna without incident for some time.
10. Then, Fluvanna Lieutenant Woodson took Officer Crockett's cotton uniform from her, despite it being issued to Officer Crockett by her home prison, claiming it was "not appropriate for transportation." However, many officers at Fluvanna were permitted to

wear the same cotton uniform, and Officer Crockett had been wearing the cotton uniform since she had been accepted at the program at Fluvanna, without incident.

11. Officer Crockett was also publicly called out and was bullied about the uniform in a formation meeting by Captain Sacra, and Officer Crockett was told she was not going out on transportation due to wearing her work uniform. It was big time bullying. Supervision was well aware Officer Crockett was wearing the only uniform the Virginia Department of Corrections had let her have at that time that accommodated her disability. Captain Sacra also called her out for wearing sunglasses (for migraines) and others that were also wearing sunglasses were not called out.
12. Thus, I reported the harassment to the Warden.
13. However, my report did not change anything.
14. On another occasion, I witnessed Officer Crockett get trapped in a small foyer at Fluvanna by the individuals working the doors when everyone knew that Officer Crockett had an episode due to being locked in a small space before.
15. It was obvious, based on everything I personally observed, that management targeted only Officer Crockett.
16. Officer Crockett was a trooper putting up with what she did. She wanted to work. She came to work, to work. The Virginia Department of Corrections needs more loyal officers like Officer Crockett.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 04 / 20 / 2026

Lina Davis-Whyte

Dropbox Sign

Audit trail

| | |
|---|---|
| **Title** | Declaration_Lina Davis Whyte v.3_TO SIGN.pdf |
| **File name** | Declaration_Lina%...v.3_TO%20SIGN.pdf |
| **Document ID** | 94904dd65d561039c45f620d4a039716ec5c0421 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| SENT | **04 / 21 / 2026**<br>00:22:41 UTC | Sent for signature to Lina Davis-Whyte (idisbeth71@gmail.com) by services@clio.com acting on behalf of brittany@haddox.law<br>IP: 73.147.47.47 |
| VIEWED | **04 / 21 / 2026**<br>00:22:57 UTC | Viewed by Lina Davis-Whyte (idisbeth71@gmail.com)<br>IP: 99.43.218.18 |
| SIGNED | **04 / 21 / 2026**<br>00:24:27 UTC | Signed by Lina Davis-Whyte (idisbeth71@gmail.com)<br>IP: 99.43.218.18 |
| COMPLETED | **04 / 21 / 2026**<br>00:24:27 UTC | The document has been completed. |